NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 200577-U

NO. 4-20-0577

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 13, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | McLean County |
| ANTHONY SAMUEL GRAMPSAS, | ) | No. 19CF15 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Scott D. Drazewski, |
| | ) | Judge Presiding. |

_____

JUSTICE TURNER delivered the judgment of the court.
Justices Harris and Holder White concurred in the judgment.

**ORDER**

¶ 1    *Held:*    (1) The State presented sufficient evidence to prove defendant was guilty of first degree murder predicated on defendant's accountability for the actions of the shooter or shooters.

        (2) The trial court did not abuse its discretion in barring Tyshon Fanning from testifying about out-of-court statements allegedly made to him by Tyjuan Bruce and Curtis Hairston about defendant's involvement in the murder of Egerton Dover.

        (3) Defendant cannot complain the trial court allowed firearm evidence unconnected to Dover's murder in this case because it appears defendant's trial counsel wanted this evidence in the case for strategic purposes. Defendant does not argue his trial counsel was constitutionally ineffective.

¶ 2    On July 23, 2020, a jury found defendant Anthony Samuel Grampsas guilty of

(1) first degree murder involving home invasion and (2) home invasion. The jury also found

defendant or one for whose conduct he was legally responsible was armed with a firearm. On

September 11, 2020, the trial court sentenced defendant to a 45-year term of imprisonment.

Defendant appeals, raising the following arguments: (1) the State did not present sufficient evidence to prove defendant was guilty of felony murder predicated on home invasion via his accountability for the shooter's or shooters' actions; (2) the trial court erred by barring defendant from introducing hearsay statements allegedly made by Curtis Hairston and Tyjuan "T-Huncho" Bruce to Tyshon Fanning that defendant was not with them when they killed Egerton Dover and knew nothing of their plan to rob Dover; and (3) the court erred in admitting evidence of firearms unconnected to Dover's murder. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                  A. The Crime Scene

¶ 5            At defendant's trial in July 2020, the State's case against defendant was based on circumstantial evidence defendant was part of a plot to rob Dover on December 5, 2018. According to the State, when Hairston and Bruce broke into Dover's residence, Dover was shot and killed.

¶ 6            The State presented evidence Bloomington police officers were dispatched to Dover's residence at 816 West Jefferson around 4:45 a.m. on December 5, 2018, after a reported shooting. Responding officers observed the front door of the residence had been kicked in and Dover had been shot and killed. Cannabis was found in plain view in both a bedroom and a walkway near the living room. The police also found three spent shell casings—two .380 casings and one 9-millimeter casing—in the home. No fingerprints were found on the entry door, front porch window, furniture, or the back door of Dover's residence. Further, the State never recovered the weapon or weapons used in the shooting.

¶ 7            Outside the home, the police noticed footprints in the snow between Dover's residence and Jefferson Street west of the residence. They also found what appeared to be more

than one set of footprints going around Dover's home, a set of footprints between the residence and a vehicle parked just outside the home, and vehicle tire tracks in the street.

¶ 8                                    B. Autopsy

¶ 9             Dr. Scott Denton, a forensic pathologist working at the McLean County coroner's office, testified Dover was shot three times.  Denton recovered a medium caliber, copper-jacketed bullet from Dover's diaphragm.  The doctor indicated two bullets passed completely through Dover's body.

¶ 10                      C.  The Victim's Activity Prior to His Murder

¶ 11            Louis Rodriguez testified he and Blake Dunn went to Bloomington the evening of December 4, 2018.  After picking up Dover, Rodriguez dropped Dover and Dunn off at the Lancaster Heights apartment complex in Normal.  Rodriguez then went to donate plasma.  He later picked up Dover, Dunn, and Alex "Weezy" Williams from Lancaster Heights and took them to Dover's house.

¶ 12            After Rodriguez took his girlfriend to work, he picked up Dover, Dunn, and Williams at Dover's house and drove them to Champaign.  In Champaign, Rodriguez dropped Dover and Williams off at a house.  Rodriguez and Dunn then went to get food.  Thirty to forty minutes later, Rodriguez and Dunn picked up Dover and Williams and headed back to Bloomington/Normal, specifically Lancaster Heights.  At the apartment complex, Rodriguez and Dunn stayed in the car.  Dover and Williams got out and returned about 10 minutes later.  The four men then returned to Dover's house.  Later, Rodriguez, Dunn, and Dover began driving to El Paso, Illinois, before turning around and dropping Dover off at his house around 3:15 a.m.

¶ 13            D. Events at Hannah Newble's Apartment Prior to Dover's Murder

¶ 14            Hannah Newble testified she lived at Lancaster Heights in December 2018.  On

December 4, 2018, Newble, Bruce, and Demarius Young were hanging out at her apartment. Around 8 or 8:30 p.m., Newble started drinking wine and became tipsy. She told Bruce and Young no one else was allowed in the apartment and then went to her room and slept. Later in the evening, she found additional people in her apartment, including defendant, Koebe (Kaydo or Kato) Harris, Bryce Crose, and one other unknown person hanging out in her living room. She stayed in the living room while some of the others were smoking marijuana in a walk-in closet where a table was set up.

¶ 15 According to Newble, around midnight, Dover and Williams came to the apartment. Williams went into the walk-in closet to talk to the other people present. Dover told Newble he came bearing gifts. They went into the kitchen because Koebe Harris was sitting in the living room. Dover gave Newble a gram of marijuana from his bag. Newble did not know if Dover was there to sell marijuana to the others, but she asked him to leave because she did not feel comfortable with Dover being around the people who were present.

¶ 16 A few minutes after Dover left, some of the other people came out of the walk-in closet looking for Dover. After realizing Dover was gone, Williams also left. According to Newble, neither Dover nor Williams came back to her apartment that night. After Dover and Williams left, the mood in the apartment changed. Bruce started criticizing Dover for leaving, saying Dover did not want to show his marijuana for fear the others would take it. Defendant and Harris were present for Bruce's verbal complaints. According to Newble, Bruce stated he wanted to rob Dover.

¶ 17 At some point, Newble told the men that Dover was her friend, and she did not know why they would talk about him like they were. She told the men they needed to leave multiple times. The men said they did not have a ride, noting it was snowing. Eventually,

defendant, Bruce, Harris, and a tall, African-American man whose name she did not know all left together. She did not see a car pick them up but saw defendant had car keys. No one from that group of men returned to her apartment that night.

¶ 18       On cross-examination, Newble testified she did not remember coming to defense counsel's office and choosing not to answer his questions. She did remember talking to defendant's private investigator, Mark Foster. Foster later testified he sat in on an interview between defense counsel and Newble on May 30, 2019, at defense counsel's office. Newble was with a man who did not identify himself. Newble did not answer any of the questions defense counsel asked her. Foster indicated he had two prior contacts with Newble.

¶ 19       Newble stated Bruce was a friend of her boyfriend and had stayed at the apartment for about five days prior to the murder. She only remembered Dover being at her apartment one time on the night he was killed, which was the time he gave her some marijuana.

¶ 20       At the time of Dover's murder, Newble was employed at Wendy's. N'Dia Montgomery was her supervisor or shift manager. Newble did not remember calling Montgomery on December 5, 2018, to tell her she could not come to work. She remembered having a conversation with Montgomery but did not remember when.

¶ 21       However, during defendant's case, Montgomery testified Newble said she did not feel safe coming to work on December 5, 2018. Montgomery also stated Newble told her Bruce had left her apartment in a red van and had come back to the apartment all bloody after the murder. Newble said she did not remember telling Montgomery those things.

¶ 22       Newble learned Dover had been killed the morning of December 5 from her boyfriend, Chris Atchison. She testified Bruce knew where Dover lived because Bruce had been to Dover's residence. Later, the State introduced evidence Bruce had searched for Dover's

address on his mobile phone. Newble also indicated she would have told the police if someone had come back to her house with bloody clothes, which nobody did. As for the times different things happened during the evening, Newble testified she could not be specific because she was not looking at the clock. The times she provided were only her best estimates.

¶ 23 Young testified he was 21 years old and currently in custody at the McLean County jail. He said the State had not made him any promises as to his other charges if he testified. He and Dover had only been friends for two or three months, but he was familiar with Dover earlier. Both he and Bruce had been staying at Newble's apartment when Dover was killed. On the night in question, Dover and Williams came to Newble's apartment when Young, Bruce, and Newble were present. Dover and Williams indicated they were going to Champaign to get marijuana and would come back. After they left, other people started showing up at the apartment.

¶ 24 At some point, Young heard people running around in the apartment and left the walk-in closet to see what was happening. Someone had run out of the apartment, leaving the door open. Newble was in the living room and upset. Young saw Harris, Dylan Messerole, Bryce Crose, Bruce, and defendant in the living room. At some point, Bruce asked Crose, who was very drunk, to leave the apartment. Terrance Rogers left then also. Young testified the people remaining at the apartment were defendant, Bruce, Harris, Dylan Messerole, Newble, and himself. They were hanging out in the living room of the apartment and then went to the walk-in closet.

¶ 25 Dover and Williams later returned to the apartment. Young, Newble, and Bruce knew they had gone to Champaign to get marijuana. Young did not know if the other people knew about Dover's marijuana. Dover gave Newble a small amount of cannabis but did not sell

or share marijuana with anyone else. Newble asked Dover to leave the apartment, and he did. Williams stayed about five minutes more and left. Defendant and Harris then took Messerole home, which left only Newble, Bruce, and Young at the apartment. Young then invited his girlfriend to the apartment. After she arrived, defendant and Harris returned to Newble's apartment with Hairston, who Young knew as "BD Lord." Hairston showed Young a video of Hairston robbing Messerole of his gun. Young recognized the video was taken in the bathroom of Newble's apartment. Young then went back and laid in bed with his girlfriend, and Newble went back to her bedroom. Later, defendant, Bruce, Hairston, Harris, Young, and Newble were all back in the walk-in closet and the conversation in the closet turned to robbing Dover.

¶ 26        Around 4 or 4:30 a.m., defendant, Bruce, Hairston, and Harris left the apartment together. Young thought Bruce leaving was odd because he had been staying at the apartment. Bruce left a firearm in the second bedroom. Only Newble, Young, and his girlfriend remained at the apartment. Neither defendant, Bruce, Hairston, nor Harris returned. The next morning, Young learned from Chris Atchison, Newble's boyfriend, that Dover had been killed.

¶ 27        Messerole testified he agreed to cooperate with the State early in the investigation in exchange for not being prosecuted for a firearm offense related to the gun he had at Newble's apartment. He went to Newble's apartment the night of December 4, 2018, to get drunk. Newble, Bruce, and Young were present when he arrived. Others including defendant, Harris, and Hairston came later. Messerole testified he was an acquaintance of defendant and Harris. While he was at the apartment, Hairston took Messerole's firearm and quickly left. Messerole continued to drink and was at the party when Dover and Williams were there for 10 to 15 minutes. Defendant and Harris gave him a ride home around 3 a.m. On cross-examination, Messerole said his gun was a 9-millimeter Taurus, which he bought a couple of days before

Dover's death without a Firearm Owners Identification (FOID) Card.

¶ 28                                    E. After the Shooting

¶ 29                    1. *Evidence Regarding a Toyota Camry*

¶ 30         The police reviewed security camera surveillance footage from the area where Dover lived and identified a gray Toyota Camry with what appeared to be a bubble mirror. Shortly before 4:45 a.m., a gray Camry was observed near 816 West Jefferson. Footage from other cameras in the area also showed a gray Toyota Camry in the area where Dover was killed. Detective Roth testified there was almost no traffic that night. The police could not obtain a license plate number on the car, see any emblems on the car, or see who was driving or occupying the vehicle. The Pantagraph, a Bloomington newspaper, published photographs of the crime scene on December 5 or 6. These pictures showed shoe prints and tire impressions.

¶ 31         The police seized defendant's grandmother's Toyota Camry, which also had an aftermarket bubble mirror. On December 14, the police examined the tires on the Camry and determined it had nonmatching tires in two different sizes. The tires on the Camry did not match the tracks left at the crime scene. The tracks at the crime scene appeared to have all been made with the same type of tire.

¶ 32         The State presented evidence defendant's grandmother, Jane Hoobler, purchased her gray 2009 Toyota Camry from Custom Auto Sales in July 2018. Peter Hettinger, owner of Custom Auto Sales, testified he received that Camry in June 2018. Before selling the car, he replaced all the tires with new Firestone 215/60R16 Champion Fuel Fighter tires at Don Owen Tire in Bloomington. The invoice from Don Owen Tire for the four tires stated they were installed on June 22, 2018, on a beige 2001 Camry, but Hettinger said the tires were installed on a gray 2009 Camry. Hettinger had written 2009 Camry Gray on the invoice. Hettinger sold the

2009 Camry to Hoobler on July 9, 2018. Suzanne Schwoerer, part owner and bookkeeper of Don Owen Tire Service, testified a technician indicated through a handwritten note on the work order that the car brought to the shop was a gray 2009 Camry, not a beige 2001 Camry. According to Schwoerer, the salesman who created the invoice neglected to add the technician's correction. The police obtained an impression of the track from a Firestone 215/60R16 Champion Fuel Fighter tire. The impression made by the tires on the car when Hoobler purchased the vehicle were consistent with the tire tracks left at the crime scene.

¶ 33                                    2. *Weapon's Evidence*

¶ 34          The police conducted searches after Dover's murder. During a search of Newble's apartment, the police located two BB guns that looked like handguns and a .25-caliber handgun. At 3477 Hummingbird Drive in Decatur, which the police were told was Bruce's residence, the police found a magazine speed loader, a state identification card for Bruce, a .22-caliber Colt pump-action rifle, shell casings, and empty ammunition boxes. In a camper at the same address, the police found a tactical gun magazine, a Taurus .40-caliber handgun, and a Glock .45-caliber handgun. At 3960 North Water Street in Decatur, which the police believed was defendant's residence, they found a handgun magazine partially loaded with 9-millimeter rounds, a partial box from a laser sight for a firearm, a temporary identification card for Bruce, and an Illinois identification card for defendant.

¶ 35          The State also presented evidence someone using Hairston's Facebook account posted pictures of a Hi-Point LCP .380-caliber handgun in the week prior to Dover's murder. On the night of Dover's murder at around midnight, someone posted a video to Hairston's Snapchat account of Hairston, Harris, and defendant. Another video showed Hairston holding up two guns. In still another video, two guns could be seen, including a Hi-Point LCP .380-caliber and a

- 9 -

G2 Taurus 9.

¶ 36    The State also presented evidence Hairston was killed at a Long John Silver restaurant in Decatur on January 4, 2019.  Two handguns were found in the restaurant, including a black Taurus PT 111 9-millimeter handgun and a silver and black Taurus PT 111 Pro 9-millimeter handgun.

¶ 37    Dustin Johnson, a forensic scientist at the Illinois State Police Morton Forensic Science Laboratory, testified as an expert in firearms identification.  Johnson testified the two Taurus 9-millimeter Luger caliber firearms seized in Decatur did not fire the .380 auto cartridge cases he was asked to compare in this case.  With regard to the cartridge cases, bullets, and firearms he was provided by the Bloomington Police Department, he determined two fired .380 auto caliber cartridges were fired by the same gun.  He also examined three bullets/bullet fragments and determined they were .380/.38 class caliber bullets and were fired by the same gun.  The bullets exhibited "nine lands and grooves, left hand twist," which is a characteristic unique to a .380-caliber Hi-Point firearm.  He was not given a .380-caliber Hi-Point firearm to determine if it fired the bullets.  He was also not provided a firearm to try to match the two .44-caliber Special fired cartridges that were submitted to him for analysis.  As noted earlier, the State was not able to find the weapon or weapons used to kill Dover.

¶ 38                                3. *Dover's Belt*

¶ 39    Trevon McGee testified he and Dover went to Chicago together in the late summer or early fall of 2018 and Dover bought a belt from a Louis Vuitton/Supreme "popup shop" on Michigan Avenue.  The strap of the belt was Supreme-branded and red and white.  The buckle was silver and had "the LV shape."  McGee saw the belt on or about December 4, 2018, at Dover's residence when Dover asked him to move the belt from the front room to a table in

the kitchen. Sometime after December 5, 2018, McGee saw a Snapchat post from Bruce's account that included Dover's belt.

¶ 40                                    4. *Defendant's Admission*

¶ 41          Defendant was arrested on January 7, 2019, at 3960 North Water Street in Decatur. He was with Bruce. He was housed in the McLean County jail while waiting for his trial. At the jail, inmates' phone calls are recorded, and law enforcement officers can listen to the recordings. During a call on July 9, 2020, at 8:13 p.m. between defendant and an unidentified female, defendant told the female he "just happened to be there whenever it went down."

¶ 42                              F. Potential Exonerating Evidence

¶ 43                                    1. *Doni Jo Tornowski*

¶ 44          Defendant called Doni Jo Tornowski, who was Harris's mother. She testified she lived at 606½ West Washington Street with Harris and two of her other children. She had known defendant—who was friends with her son—for five or six years and was familiar with his voice. She had to be at work at 6 a.m. on December 5, 2018, and had alarms set at 4:45 a.m., 5 a.m., and 5:15 a.m. At some point before 4:45 a.m., she woke up and heard Harris enter the home and walk upstairs. Tornowski also heard Harris and defendant talking downstairs. She did not know what time this occurred, other than sometime before 4:45 a.m. After hearing Harris and defendant talking, she did not hear anyone leave. However, when she left for work at 5:50 a.m., she saw her son in his room but did not see defendant.

¶ 45                              2. *Hearsay Statements by Hairston and Bruce*

¶ 46          At trial, pursuant to Illinois Rule of Evidence 804(b)(3) (eff. Jan. 1, 2011), defense counsel asked to introduce hearsay statements allegedly made by Hairston and Bruce to

Fanning around three and a half weeks after Dover's murder. Because Bruce invoked his fifth amendment right not to testify and Hairston was no longer living, the trial court found both Bruce and Hairston were unavailable to testify pursuant to Rule 804. The court also found the statements were against the declarant's interests.

¶ 47    Before the trial court ruled whether these statements would be admitted, Fanning testified outside the presence of the jury about the alleged statements made by Bruce and Hairston. Fanning indicated he was 18 years old and lived in Normal. He had family in Decatur, visited there often, and had known defendant for about three years. He and defendant were friends but not close, seeing each other at birthday parties and special occasions. Fanning also had met Bruce and Hairston not long before a New Year's Eve party in 2018. He was not close to either Bruce or Hairston.

¶ 48    According to Fanning, at the New Year's Eve party at the Kush Club in Decatur, he talked to defendant, Bruce, and Hairston. Fanning did not know Dover but did know of his murder. Fanning said Hairston brought up Dover's shooting and explained it was supposed to be a robbery but he and Dover started wrestling. Hairston pulled a gun on Dover, and the gun fell to the floor. Hairston was able to get the gun first and shoot Dover. Bruce said he was also at Dover's house. Neither Hairston nor Bruce said defendant was at Dover's house or gave them a ride there. They did not say anything about where defendant was when the shooting occurred. Defense counsel asked if either Bruce or Hairston said whether they dropped off defendant before they went to Dover's house. Fanning said no, but Hairston and Bruce explained defendant was not with them at Dover's house. When defense counsel asked if Bruce and Hairston explained to defendant what they were going to do, Fanning responded, "No. They explained how—like, they didn't—I don't know what they explained specifically, but I just

- 12 -

know that they wasn't—they didn't tell them, like, what they was going to do."

¶ 49　　　　Fanning testified he was interviewed by Bloomington police officers in January 2019. The interview, which took place in front of Fanning's house, was recorded. The police asked him what he knew about Dover's death. Fanning said the police got the story correct in part. Fanning told the police Hairston was his "homie" and had shot Dover. He also told the police Hairston had just died from a shooting in Decatur on January 4, 2019. He told the police Hairston said he was not with defendant. When the police asked who was there when Dover was shot, Fanning told the police it was Hairston. When the police asked him if anyone else was with Hairston, Fanning said "the other dude that you all got," which was Bruce. Fanning told the police Bruce and Hairston told him Bruce planned to rob Dover and take his marijuana.

¶ 50　　　　When the police asked Fanning how he knew what happened at Dover's house, Fanning told the police he heard about it from defendant, Bruce, and Hairston. When the police asked how defendant's name came up with regard to the case, he said defendant, Bruce, and Hairston were "cliqued up together." Fanning told the police Hairston and Bruce ran out of the house after shooting Dover without taking the marijuana they wanted. According to Fanning, Hairston and Bruce then picked up defendant wherever they dropped him off. In addition to telling the police that he talked to defendant, Hairston, and Bruce at the New Year's Eve party, Fanning also told the police he spoke with Hairston alone in a car, and Hairston told the same story.

¶ 51　　　　Fanning claimed he felt no need to protect defendant when he was talking to the police. Fanning said he did not think defendant knew what was going to happen. Defendant told him he thought they were just going to the store and dropped him off. Fanning also said he had seen defendant let other people drive his car back in 2018. On cross-examination, Fanning said

people were drinking alcohol and smoking weed at the New Year's Eve party.

¶ 52      After listening to Fanning's testimony outside the jury's presence, the trial court found the statements allegedly made by Hairston and Bruce were statements against interest and both Hairston and Bruce were unavailable. As a general rule, the court noted an unavailable declarant's unsworn, out-of-court statement he committed a crime a defendant is charged with committing is inadmissible at the defendant's trial. Citing *People v. Tenney*, 205 Ill. 2d 411, 793 N.E.2d 571 (2002), the court indicated our supreme court has observed this rule is necessary or everyone accused of a crime would be introducing perjured testimony that a third party who was either deceased or otherwise unavailable admitted committing the charged offense.

¶ 53      The trial court noted a limited exception to the general rule initially fashioned by the United States Supreme Court in *Chambers v. Mississippi*, 410 U.S. 284 (1973), in which the court held due process under the federal constitution required the admission of otherwise inadmissible declarations against penal interest if the statements were made under circumstances providing considerable assurance of the statements' reliability. The trial court noted relevant factors to consider include but are not limited to (1) whether the statement was made spontaneously to a close friend or relative shortly after the crime occurred; (2) whether the statement was corroborated by the evidence in a case; (3) whether the statement was self-incriminating and against the declarant's interest; and (4) whether the declarant was available for cross-examination.

¶ 54      According to the trial court:

> "The existence of all four criteria is not a condition precedent for a hearsay statement to come within the exception. However, generally if one or more criteria, but not all four, are met, the hearsay statements are held to be

insufficiently trustworthy. The primary consideration in determining whether out[-]of[-]court statements against penal interest [are] admissible is whether the extra judicial statement was made under circumstances which would provide considerable assurance of its reliability by objective indicia of trustworthiness."

The trial court indicated the statements allegedly made by Hairston and Bruce to Fanning were not spontaneous and Fanning was neither a close friend of Hairston nor Bruce. In addition, the court also indicated Hairston and Bruce's alleged statements were not corroborated by other evidence in the case. Finally, the court noted the lack of any opportunity for the State to cross-examine Bruce or Hairston about the statements attributed to them. As a result, the court refused to allow Fanning to testify as to what Bruce and Hairston allegedly told him.

¶ 55                                   3. *Loaning Out Vehicle*

¶ 56        Fanning was allowed to testify he had observed defendant permitting other people to use his car. Officer Anna Legner of the Bloomington Police Department testified she stopped a gray, four-door Toyota vehicle on November 25, 2018. Quentin Jackson was driving the vehicle. Defendant and Harris were passengers.

¶ 57                              G. Verdict and Sentencing

¶ 58        After deliberations, the jury found defendant guilty of (1) first degree murder involving home invasion and (2) home invasion. The jury also found defendant or one for whose conduct he was legally responsible was armed with a firearm. On September 11, 2020, the trial court sentenced defendant to 45 years in prison. Defendant's motion to reconsider his sentence was denied on November 13, 2020.

¶ 59        This appeal followed.

¶ 60                                    II. ANALYSIS

- 15 -

¶ 61                          A. Sufficiency of the Evidence

¶ 62          Defendant first argues the State failed to prove him guilty beyond a reasonable

doubt of first degree murder predicated on home invasion via the State's accountability theory.

Defendant criticizes the State's case for a number of reasons.  According to defendant, the State

failed to produce evidence of an alleged plan involving him to rob or harm Dover.  The State

failed to establish the suspect vehicle seen in the security footage near Dover's residence was his

grandmother's car.  Further, even if the State could establish the suspect vehicle was defendant's

grandmother's car, the State could not establish defendant was in the vehicle at the victim's

home when Dover was murdered.  Defendant points out the State did not argue defendant went

into Dover's house or even got out of his grandmother's vehicle while it was allegedly at

Dover's residence.  Finally, defendant argues the State did not establish defendant knew the

alleged perpetrators were armed with a firearm.

¶ 63          When a defendant challenges the sufficiency of the evidence to convict, a

reviewing court determines whether any rational trier of fact could have found the required

elements of the crime beyond a reasonable doubt when the evidence presented at trial is viewed

in a light most favorable to the prosecution with all reasonable inferences drawn in favor of the

State.  *People v. Newton*, 2018 IL 122958, ¶ 24, 120 N.E.3d 948.  It is not this court's function to

retry a defendant.  *Newton*, 2018 IL 122958, ¶ 24.

¶ 64          According to our supreme court, a jury can consider inferences which flow from

the evidence before it and need not search out explanations consistent with innocence and then

raise those explanations to a level of reasonable doubt.  *Newton*, 2018 IL 122958, ¶ 24.  "[A]

trier of fact is allowed to consider the evidence in light of his or her own knowledge and

observations in the affairs of life."  *Newton*, 2018 IL 122958, ¶ 28.  This court will not reverse a

conviction unless the evidence is so unsatisfactory, improbable, or unreasonable as to create a reasonable doubt of defendant's guilt. *Newton*, 2018 IL 122958, ¶ 24.

¶ 65    Defendant was convicted via his accountability for the murder of Dover. Pursuant to section 5-2(c) of the Criminal Code of 2012 (Criminal Code) (720 ILCS 5/5-2(c) (West 2018)):

"A person is legally accountable for the conduct of another when:

* * *

(c) either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense.

When 2 or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the common design or agreement and all are equally responsible for the consequences of those further acts. Mere presence at the scene of a crime does not render a person accountable for an offense; a person's presence at the scene of a crime, however, may be considered with other circumstances by the trier of fact when determining accountability."

¶ 66    We note "active participation has never been a requirement for the imposition of criminal guilt under an accountability theory." *People v. Taylor*, 164 Ill. 2d 131, 140, 646 N.E.2d 567, 571 (1995). "One may aid and abet without actively participating in the overt act." *Taylor*, 164 Ill. 2d at 140, 646 N.E.2d at 571. As our supreme court has explained:

"A defendant may be deemed accountable for acts performed by another if defendant shared the criminal intent of the principal, or if there was a common criminal plan or purpose. [Citations.] Words of agreement are not necessary to establish a common purpose to commit a crime. The common design can be inferred from the circumstances surrounding the perpetration of the unlawful conduct. [Citations.] Proof that defendant was present during the perpetration of the offense, that he maintained a close affiliation with his companions after the commission of the crime, and that he failed to report the crime are all factors that the trier of fact may consider in determining the defendant's legal accountability. [Citation.] Defendant's flight from the scene may also be considered in determining whether defendant is accountable. [Citation.] Evidence that defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design also supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another." *Taylor*, 164 Ill. 2d at 140-41, 646 N.E.2d at 571 (1995).

¶ 67    The jury in this case heard the following evidence. Newble and Young testified Bruce was talking about robbing Dover because Dover left without sharing his marijuana with the other individuals attending the party. Young testified defendant was present when Bruce made these threats. Young also stated defendant left the party with Bruce, Hairston, and Harris after hearing Bruce's threats to rob Dover. Video footage from security cameras in the area of Dover's house around the time Dover was shot and killed show a gray Toyota Camry with what appeared to be a bubble mirror. Defendant's grandmother's Toyota Camry had an add-on bubble mirror.

¶ 68          Defendant's grandmother purchased her gray Toyota Camry in July 2018 from Custom Auto Sales. The owner of Custom Auto Sales testified he had four new Firestone tires installed on the Camry before he sold it to defendant's grandmother. When the police seized defendant's grandmother's Camry on December 13, 2018, which was eight days after the murder and around five months after the vehicle was purchased with new tires, the vehicle had mismatched tires. While the tires on the Camry when it was seized did not match the tire tracks left at the scene of Dover's murder, the State introduced evidence the tires on the Camry when it was sold to defendant's grandmother were consistent with the tire tracks left at the scene. Finally, defendant admitted in a phone call at the jail to an unknown female that he just happened to be there when it all went down.

¶ 69          Based on this evidence and the natural inferences that can be drawn from this evidence, a rational trier of fact could have found defendant guilty based on accountability. The jury could have determined defendant knew Bruce was mad and wanted to rob Dover. Defendant, Bruce, Hairston, and Harris all left Newble's party together. Defendant had his grandmother's gray Toyota Camry in Bloomington. Not long after the four left Newble's apartment, multiple security cameras recorded a gray Toyota Camry in the area of Dover's home around the time he was killed, and defendant admitted he was present when it all went down. Even if the jury did not believe defendant was present, a rational jury could have still found defendant aided Bruce and Hairston by loaning them his grandmother's car, knowing they were going to use the car while robbing Dover.

¶ 70          The trier of fact could have considered that defendant never informed the police his car may have been used in the murder. In addition, the jury could have also concluded defendant was trying to cover up his involvement in the crime by the fact the tires that were only

- 19 -

six months old on his grandmother's Camry were replaced by mismatched tires. Finally, the jury heard evidence defendant continued to associate with at least Bruce, considering defendant was with Bruce when defendant was arrested.

¶ 71 Defendant's reliance on Tornowski's testimony she heard defendant and her son, Harris, talking before her 4:45 a.m. alarm went off is misplaced. She did not testify she heard defendant and her son talking in the 10 to 15 minutes immediately before her alarm went off. In fact, Tornowski testified she did not know what time she heard them talking. She only knew it was sometime before her 4:45 a.m. alarm went off. Further, she testified she did not know how much time elapsed between when she heard defendant and her son and when her 4:45 a.m. alarm sounded. Contrary to defendant's argument, this was not strong evidence defendant could not have been present when Dover was shot around 4:45 a.m.

¶ 72                              B. Statements by Hairston and Bruce

¶ 73 Defendant next argues the trial court erred in excluding Fanning's testimony regarding statements allegedly made by Hairston and Bruce to Fanning at a New Year's Eve party, approximately 3½ weeks after Dover's murder, and a later statement by Hairston alone. A trial court's evidentiary rulings will only be disturbed if the court abused its discretion. *People v. Wheeler*, 226 Ill. 2d 92, 132, 871 N.E.2d 728, 750 (2007).

¶ 74 According to Fanning, Bruce and Hairston told him they went to Dover's house to rob him. However, Dover and Hairston started fighting, and Hairston shot Dover. Fanning claimed in the offer of proof that Bruce and Hairston said defendant was not with them. Fanning also implied Bruce and Hairston said they did not tell defendant what they were going to do to Dover.

¶ 75 Defendant argues these statements should have been admitted pursuant to Illinois

Rule of Evidence 804(b)(3) (eff. Jan. 1, 2011), which states:

> "*(b) Hearsay Exceptions.* The following are not excluded by the hearsay
>
> rule if the declarant is unavailable as a witness:
>
> \* \* \*
>
> *(3) Statement against Interest.* A statement which was at the time of its
>
> making so far contrary to the declarant's pecuniary or proprietary interest, or so
>
> far tended to subject the declarant to civil or criminal liability, or to render invalid
>
> a claim by the declarant against another, that a reasonable person in the
>
> declarant's position would not have made the statement unless believing it to be
>
> true. A statement tending to expose the declarant to criminal liability and offered
>
> in a criminal case is not admissible unless corroborating circumstances clearly
>
> indicate the trustworthiness of the statement."

The trial court found both Bruce and Hairston were unavailable. Hairston was deceased, and Bruce invoked his fifth amendment right against self-incrimination. The court also found the statements exposed Bruce and Hairston to criminal liability.

¶ 76 Defendant contends the remainder of the trial court's analysis was flawed. According to defendant, the corroborating circumstances in this case clearly indicate the trustworthiness of this statement and the trial court erred by not allowing its presentation to the jury. Defendant argues a trial court does not need to be convinced exculpatory statements are true to admit the statements.

¶ 77 However, the circumstances in this case do not clearly indicate the trustworthiness of the statements allegedly made by Hairston and Bruce to Fanning. Fanning claims Hairston and Bruce told him that defendant was not present at Dover's house at the time of the murder and

did not know what Hairston and Bruce were going to do at Dover's house. No evidence in the record supports this claim, and defendant's admission in his phone call from jail that he was present contradicts the alleged statements.

¶ 78    Defendant attempts to demonstrate corroboration of the statements with the following facts and the State's circumstantial evidence. Bruce had possession of Dover's belt, which had been at Dover's residence the day before he was killed. While at Newble's apartment the night of Dover's murder, Bruce said he wanted to rob Dover. Bruce previously had searched for Dover's address on his cell phone. Firearms were discovered in Bruce's home. Hairston took Messerole's gun at Newble's apartment. Hairston was sometimes in possession of firearms. Defendant also notes witnesses testified Hairston and Bruce left Newble's apartment together the night of the shooting. While this evidence implicates Hairston's and Bruce's own involvement in the murder of Dover, it does not corroborate Hairston's and Bruce's alleged statements defendant was not with them at the time of the murder or did not know what they planned to do at Dover's house.

¶ 79    Defendant also points to Tornowski's testimony she heard defendant in her house before her alarm went off at 4:45 a.m. as corroboration for alleged statements Bruce and Hairston made to Fanning that defendant was not involved in Dover's murder. As we explained above, Tornowski's testimony provided no corroboration defendant was not present at Dover's house when the murder occurred. Tornowski offered no testimony as to the time she heard defendant in her house the night of the shooting.

¶ 80    As a result, defendant has failed to establish the trial court abused its discretion in not allowing Fanning to offer testimony as to the out-of-court statements allegedly made by Bruce and Hairston.

¶ 81                    C. Firearm Evidence

¶ 82        Defendant next argues the State's introduction of firearm evidence unrelated to

Dover's death unfairly prejudiced defendant's trial and denied defendant justice. Citing *People*

*v. Carlson*, 79 Ill. 2d 564, 577, 404 N.E.2d 233, 239 (1980), defendant argues that a court of

review will grant relief if an error was so prejudicial at trial that real justice has been denied or

the jury's verdict may have resulted from the error even if defense counsel did not object to the

evidence at trial. Defendant points out the police never found the weapon used to kill Dover and

the State's weapons evidence was not probative of defendant's guilt. Instead, its only purpose

was to show defendant's common association with criminal activity.

¶ 83        The State argues defendant's position on appeal is contrary to the position

defendant took at trial. We agree. This does not seem to be a situation where this weapons

evidence simply slipped by defendant's trial counsel. Instead, it appears defense counsel had a

strategy to allow this evidence into the case. We note defendant does not argue his trial counsel

was constitutionally ineffective.

¶ 84        The State suggests defense counsel wanted to focus the jury's attention on the

other guns to try to point to other suspects and to sow confusion about the guns and who owned

them. In addition, although not argued by the State, defense counsel may have wanted this gun

evidence introduced because counsel thought it would help corroborate the self-incriminating

hearsay statements allegedly made by Bruce and Hairston to Fanning. While defendant's

appellate counsel complains this evidence should not have been allowed at trial, we note counsel

relied on this gun evidence in the prior argument as to why Bruce and Hairston's hearsay

statements should have been admitted at defendant's trial.

¶ 85        We agree with the State this is not a situation where defendant forfeited any

objection to the gun evidence. Instead, it appears defense counsel waived any objection to the gun evidence as part of his trial strategy. As the State notes, a defendant cannot acquiesce to the way a trial proceeds and later argue on appeal the court erred for allowing the trial to proceed in that manner. *People v. Ramirez*, 2013 IL App (4th) 121153, ¶ 78, 996 N.E.2d 1227.

¶ 86                                     III. CONCLUSION

¶ 87          For the reasons stated, we affirm the defendant's conviction in this case.

¶ 88          Affirmed.