NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241407-U

NO. 4-24-1407

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 26, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Henry County |
| JOHN M. BROSE, | ) | No. 23CF177 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Colby G. Hathaway, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Knecht and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, holding (1) it lacked jurisdiction to consider the
sufficiency of the evidence of a lesser included offense that merged with the
conviction for aggravated driving under the influence; (2) defendant did not
provide sufficient evidence to show ineffective assistance of counsel on direct
appeal; (3) the trial court conducted an adequate preliminary *Krankel* inquiry (see
*People v. Krankel*, 102 Ill. 2d 181 (1984)), and its denial of appointment of conflict
counsel was not against the manifest weight of the evidence; and (4) counsel was
not required to certify defendant was eligible for a waiver of assessments because
defendant was not entitled to a waiver of assessments for a violation of the Illinois
Vehicle Code in Henry County.

¶ 2    In June 2023, the State charged defendant, John M. Brose, with felony driving while

his driver's license was revoked (625 ILCS 5/6-303(a) (West 2022)) (count I), two counts of

aggravated driving under the influence (DUI) (*id.* § 11-501(a)(2), (d)(1)(A), (2)(C) (count II);

(a)(2), (d)(1)(G), (2)(A) (count III)), and two counts of aggravated DUI alleging, in part, he drove

with an alcohol concentration in his breath of 0.08 or more (*id.* § 11-501(a)(1), (d)(1)(A), (2)(C)

(count IV); (a)(2), (d)(1)(G), (2)(A) (count V)). In August 2024, the trial court conducted a jury trial. The evidence presented included defendant's Breathalyzer test results showing an alcohol concentration of 0.082. A police officer testified regarding the events following the traffic stop. The testimony of the arresting officer was also presented. A jury found defendant guilty on all counts. Before sentencing, the court merged the aggravated DUI convictions and sentenced defendant on one count of aggravated DUI with an alcohol concentration in the blood or breath of 0.08 or more.

¶ 3        Defendant *pro se* filed a motion for a new trial and sought the appointment of conflict counsel, alleging ineffective assistance of counsel because counsel failed to (1) investigate or present evidence of defendant's acid reflux and its potential effect on the test results, (2) present evidence of the margin of error of the Breathalyzer, (3) challenge the manner in which an officer administered a horizontal gaze nystagmus (HGN) test, and (4) present evidence defendant did not smell of alcohol or slur his words. The trial court conducted a preliminary inquiry under *People v. Krankel*, 102 Ill. 2d 181 (1984), and denied defendant's motion, finding the claims lacked merit or were matters of trial strategy.

¶ 4        Defendant appeals, arguing (1) the evidence was insufficient to prove him guilty beyond a reasonable doubt of actual impairment, (2) counsel rendered ineffective assistance based on counsel's failure to challenge evidence the State presented concerning actual impairment and failing to introduce evidence of the margin of error of the Breathalyzer, (3) the trial court erred by refusing to appoint new counsel following a preliminary *Krankel* inquiry or by otherwise conducting an inadequate inquiry, and (4) counsel rendered ineffective assistance by failing to certify defendant was eligible for a waiver of assessments.

¶ 5        We disagree and affirm.

¶ 6                                        I. BACKGROUND

¶ 7            The State charged defendant in connection with a traffic stop on June 10, 2023, in Kewanee, Illinois. In August 2024, the trial court conducted defendant's jury trial.

¶ 8                                     A. Trial Evidence

¶ 9                                      1. *Jacob Lang*

¶ 10            Jacob Lang testified he had been a Kewanee police officer for two years and had been trained in the detection of alcohol impairment. Lang had made about eight total DUI arrests over the course of his career and around four at the time of defendant's arrest.

¶ 11            On June 10, 2023, Lang initiated a traffic stop of defendant's vehicle after seeing the vehicle stopped at a stop sign for an unusual amount of time. Defendant did not immediately pull the vehicle over, and when he did so, the vehicle struck the right-side curb. Video of the stop was shown to the jury, along with video from Lang's body camera showing the events that occurred after the stop. Defendant advised Lang that he had a few drinks that night and did not have a driver's license. Lang observed defendant's eyes were bloodshot and glassy.

¶ 12            Lang administered field sobriety tests. Defendant informed Lang he could not accurately perform a walk-and-turn test because he had flat feet. Lang then performed an HGN test. Based on that test, Lang believed defendant likely consumed alcohol and was impaired.

¶ 13            Defendant was transported to the police station, and Lang began a 20-minute observation period to ensure defendant did not have any residual alcohol in his mouth before performing a Breathalyzer test. Defendant was not allowed to eat or drink during that time, and Lang did not observe him vomit or burp. However, Lang was not certified to administer the Breathalyzer test and placed defendant in a cell, causing Lang to be unable to observe him for the entire 20-minute period. As a result, a second 20-minute observation period was conducted.

¶ 14                          2. *Joshua Carpenter*

¶ 15          Kewanee Police Officer Joshua Carpenter testified he was certified to conduct defendant's Breathalyzer test. Carpenter did not observe any warning signs the Breathalyzer was not working properly. The Breathalyzer had been tested for accuracy within 62 days of the test. Carpenter testified the Breathalyzer would run a blank test and if the results showed zeros, Carpenter would know the machine was accurate and nothing was obstructing it. Then the Breathalyzer would run one "with the gas," which Carpenter said "shows that it's on, I guess, calibrated correctly."

¶ 16          Tickets from the Breathalyzer showed that, on June 1, 2023, the Breathalyzer had a dry gas target of 0.078 and registered a "CHK" of 0.079, which presumably was the result using that gas. The ticket said the system check passed. On July 1, 2023, the Breathalyzer was tested with a dry gas target of 0.078 and returned a result of 0.078. The result of defendant's June 10, 2023, test was an alcohol concentration in his breath of 0.082. The State did not elicit further details about the calibration process, and defense counsel did not cross-examine Carpenter. The State then rested.

¶ 17                          3. *Defendant*

¶ 18          Defendant testified he had three drinks the night of June 10, 2023, and described them as "earlier, earlier, earlier on." He clarified that he had two drinks at a bar but did not drink for at least an hour before leaving and then had one beer 30 to 45 minutes before leaving a friend's house.

¶ 19          Defendant testified he pulled over slowly because there was "rubble" in the road and the curb was "crumbling." Defendant stated he could not do the walk-and-turn test because he had flat feet, arthritis in his feet, and bone spurs, all of which meant he had poor balance.

- 4 -

¶ 20 Defense counsel asked defendant, "[W]hen the officer was observing you for the 20-minute observation period, did you burp, did you have any sort of issues during that time?" Defendant replied, as follows:

"Well, I was really nervous, and I was—my stomach—I have a stomach problem, so I have acid reflux and a few other things kinda like with my stomach, so it was kind of tightened up because I was really nervous, and *** I was kinda having a little bit of a problem. I was trying to drink water when I was in the cell, but it wasn't really helping too much."

¶ 21 On cross-examination, the following colloquy occurred:

"Q. Okay. And you were drinking water during the first observation period while you were in your cell?

A. Before *** the observation period, yeah—

Q. And—

A. —just out of the faucet.

Q. And you knew—had you been read the warning to motorist at that point in time?

A. Mm-mm. No.

Q. Okay. But the observation period was re-started after that, so you had a 20-minute period that you—

A. Well, there was the one 20-minute period, and *** then I was put in the cell, but before that, before the first observation period, I was drinking water when I was in the cell because I was having problems with acid coming back up in my stomach."

¶ 22                          B. Closing Arguments

¶ 23          During closing arguments, defense counsel pointed out perceived weaknesses in the State's case. Counsel then argued to the jury, as follows:

> "The next thing we see is [defendant] in the police department, and there was testimony that he blew a .082 and that the [Breathalyzer] at the time was accurate.

> What we see here on this check here is, there's a dry gas target number .078. That's what they're going for. That's the target here. What did the [Breathalyzer] read out? .079. The [Breathalyzer] is not calibrated correctly. The [Breathalyzer] is not working as it should because those numbers should match. Here's the target number given the dry input. Here's the number that it actually outputs.

> That's the test that the [Breathalyzer] did on 6/1 of 2023. That's the before test. So we know from that date on, it's not working correctly, that those numbers are not accurate, or those two numbers should match up. .078 should match .078 in the check, but it doesn't say .078. It's .079.

> What we're also talking about here is the difference between .08 and under .08. [Defendant] blew a .082, so if it's off even a little bit, that's the difference here between being over .08 and under .08."

¶ 24                          C. Jury Questions and Verdict

¶ 25          During deliberations, the jury sent a note with three questions, asking, (1) " 'Was the breathalyzer test thrown out as evidence' "; (2) " 'If it was not, are we able to see it? The ticket for calibration' "; and (3) " 'What was thrown out? Number 5 by the Prosecution was.' " The State's exhibit No. 5 was the June 10, 2023, Breathalyzer ticket, and exhibit No. 6 was the July 1,

2023, calibration ticket. Both had been entered into evidence.

¶ 26 After discussion with defense counsel and the State, the trial court responded to the jury, " 'All exhibits tendered were admitted into evidence. This response is being brought to you with State's Exhibits 5 and 6.' "

¶ 27 Awhile later, the jury sent a second note asking, "Does the [blood alcohol concentration (BAC)] calibration test have to be the same to guarantee accuracy? Calibration test 6/1/23. If not, how much variance exists in the test?" During discussion of the matter, the following colloquy occurred:

"THE COURT: So we can't answer the question, 'If not, how much variance exists in the test,' because they've—obviously, we can't provide them with additional testimony.

'Does the BAC calibration test have to be the same to guarantee accuracy?' I guess my only thought on a potential response to, I guess, in an attempt to clarify the issue, would be something to the effect of, 'The machine passed the calibration test,' which is clear from what they already have, but I don't want to—

[DEFENSE COUNSEL]: I disagree with that statement, Your Honor, and it's just because—that was the testimony of the guy who did it, but there is evidence that that may not be an accurate statement, and that was my argument at—

THE COURT: Well, your argument was, there was some variance between the calibration test. But it passed the test. There's no dispute about that. It was off between .078 and .079, which is within the variance that's allowable, so it did pass the calibration test.

[DEFENSE COUNSEL]: Well, but we don't have that testimony. There

was no testimony as to what variance is allowable, so I don't believe the Court could offer *** further information here.

THE COURT: No, the tickets themselves say it passed the test.

[DEFENSE COUNSEL]: Yeah.

THE COURT: It's on there.

[DEFENSE COUNSEL]: Okay.

THE COURT: So it's not a dispute about it passing the calibration test. It did pass the calibration test.

What the margin—acceptable margin of error is, I don't know. There wasn't any testimony about that. We can't add to that. We can't provide more factual information."

The trial court responded to the jury, " 'You have heard all the evidence and testimony in this case. You should continue deliberations.' "

¶ 28 The jury found defendant guilty on all counts.

¶ 29 D. *Krankel* Proceedings

¶ 30 Subsequently, defendant filed a *pro se* motion for a new trial and appointment of conflict counsel, alleging ineffective assistance of trial counsel. Before sentencing, the trial court conducted a preliminary *Krankel* inquiry.

¶ 31 Defendant told the trial court he believed defense counsel rendered ineffective assistance in multiple respects, including by failing to (1) introduce evidence of the margin of error of the Breathalyzer, (2) investigate or introduce evidence of the effect of defendant's acid reflux on the Breathalyzer test results, (3) challenge the administration of the HGN test, and (4) elicit testimony that defendant did not slur his speech, have an odor of alcohol on his breath, or show

- 8 -

signs of impairment, other than having bloodshot eyes.

¶ 32    Regarding the margin of error, defendant told the trial court the following:

"I never received that, the breath ticket, in my discovery that I was supposed to get a copy of everything, and we never discussed that. So there was something that the jury asked about as far as what is the margin of error.

Well, I think, according to the [National Highway Traffic Safety Administration], or maybe it's the State Police—I believe I have it here somewhere in my papers—it's 10 percent of the target number, so if their target number is .08, that means it could be .008 off. So that was never brought up, and I was—never discussed it or anything. So they were asking about that margin of error. I think that should have been presented.

I never really had a chance to discuss it with him, but I found it in like ten minutes. You know, it wasn't really very hard. But I didn't know to look for it because I never received that as far as my discovery so that I could be able to communicate with him."

Defendant later added:

"[L]ike I said, they were asking questions about what is the margin of error. The margin of error is .008. So this is in hindsight looking back on it, but I knew nothing about the breath ticket. Nothing was ever discussed with me about it. And I think that was kind of lacking there because there should have been—there should have been some more information on that.

The fact is that there was a .008 margin of error. That would mean that if I blew a .082, that means that I could be at .074, or it could be as high as .09. And

anything within that range is considered an accurate—it's an accuracy test.

And I googled it, of course, so—I mean, I know I'm not an expert, but I believe that is the correct—the correct answer as far as what is the margin of error. I believe it is 10 percent of the target rate, which would make it .008, approximately.

So that could have been brought up to the jury, absolutely, because they were debating on *** we don't see any other evidence, *** that I was intoxicated."

¶ 33    Regarding acid reflux, defendant informed the trial court, as follows:

"[A]s far as *** my medical records and everything go, there was a case, *People [v.] Bonutti*, [212 Ill. 2d 182 (2004),] that I discussed with [defense counsel] about acid reflux and that it can affect the test results. There was never really much discussion about that because there was a red flag on it, and they said that's because they changed the Administrative Code to only include vomiting, but that still doesn't mean scientifically speaking, from a medical perspective, that that could—could possibly raise the blood-alcohol content."

¶ 34    Defense counsel told the trial court, in relevant part, the following:

"There are a number of statements here that I disagree about that [defendant] has made. I don't believe at any point in time I was ineffective, and the big thing to look at in a case like this is, this is a case where we have a legal presumption that he is drunk with a .08 blow.

My goal here first was to try to get rid of that .08 blow, *** which I attempted to do and presented to the jury that the ticket that the [Breathalyzer] gave was different, it wasn't the target number on it, arguing that that was not working properly at the time, and I made those arguments to the jury."

Counsel did not specifically address defendant's concern about the effect of acid reflux on Breathalyzer test results or *Bonutti*.

¶ 35    The trial court asked defense counsel questions but did not inquire about the allowable margin of error for calibration of the Breathalyzer or the actual margin of error of the particular machine that was used. The court noted there were two observation periods and clarified that an observation period was done correctly. However, the court did not inquire about acid reflux.

¶ 36    The trial court denied the motion for appointment of conflict counsel, explaining as follows:

"All right. So, [defendant], I've considered what you filed in your motion as well as your—the factual basis, the reasons why you were making these claims here today. I've had a chance to speak with [defense counsel] about those as well.

At this point I don't believe that it's necessary to appoint other counsel to represent you. I don't find that there is merit to the claims that you're presenting. What you're presenting, these are basically trial strategy, trial decisions.

[Defense counsel] was aware of these issues. He presented a strong defense at the case given the circumstances, the facts that were alleged. There's obviously some level of discretion there that [defense counsel] has when he's proceeding in a jury trial about what evidence he's going to present and what that might open the door to as far as the State's response or how the State could bring in additional evidence based on those things.

So I do believe that his decisions were appropriate there."

¶ 37    E. Sentencing

¶ 38    Defendant's presentence investigation report showed he received a monthly

payment from the Supplemental Nutrition Assistance Program (SNAP). Defense counsel did not file a waiver of assessments certifying defendant was entitled to a waiver based on his receipt of government benefits.

¶ 39 The State told the trial court it was proceeding on (1) one count of aggravated DUI while the alcohol concentration in the blood or breath was 0.08 or more and (2) the count of felony driving while defendant's license was revoked. It was the "State's contention the others would merge into those two counts." The court sentenced defendant on those two counts to concurrent terms of five years and six months in prison and three years in prison, respectively. The court also ordered defendant to pay a "Criminal Assessment" based on his DUI conviction.

¶ 40 Defendant filed a motion to reconsider sentence, which did not mention the assessment, and the trial court denied the motion.

¶ 41 This appeal followed.

¶ 42                                II. ANALYSIS

¶ 43 Defendant appeals, arguing (1) the evidence was insufficient to prove him guilty beyond a reasonable doubt of actual impairment, (2) counsel rendered ineffective assistance based on counsel's failure to challenge evidence the State presented concerning actual impairment and failing to introduce evidence of the margin of error of the Breathalyzer, (3) the trial court erred by refusing to appoint new counsel following a preliminary *Krankel* inquiry or by otherwise conducting an inadequate inquiry, and (4) counsel rendered ineffective assistance by failing to certify defendant was eligible for a waiver of assessments.

¶ 44 We disagree and affirm.

¶ 45                         A. The Sufficiency of the Evidence

¶ 46 Defendant first contends the State failed to prove him guilty beyond a reasonable

doubt of actual impairment. However, because defendant was not sentenced on the actual-impairment counts, which merged with the aggravated DUI count, we lack jurisdiction to address the validity of defendant's unsentenced convictions.

¶ 47                                    1. *The Applicable Law*

¶ 48          Except as provided by rule, the appellate court's jurisdiction is limited to reviewing final judgments. Ill. Const. 1970, art. VI, § 6. A judgment does not become final in a criminal case until a sentence is imposed. *People v. Relerford*, 2017 IL 121094, ¶ 71. Accordingly, this court has no jurisdiction to determine the validity of an unsentenced conviction. *Id.* ¶ 75; *People v. Jamison*, 2018 IL App (1st) 160409, ¶ 37.

¶ 49          In *Relerford*, the Illinois Supreme Court held that the appellate court lacks jurisdiction to consider the merits of a guilty finding on a properly merged count when no sentence was imposed on the merged count. *Relerford*, 2017 IL 121094, ¶ 71. To the extent the appellate court has any jurisdiction to address the nonfinal convictions, that jurisdiction is limited to ordering a remand for imposition of sentences on the lesser convictions. *Id.* ¶ 75.

¶ 50                                    2. *This Case*

¶ 51          In this case, we lack jurisdiction to address the sufficiency of the evidence of defendant's convictions alleging he was actually impaired because those convictions merged into a conviction of aggravated DUI with an alcohol concentration in the blood or breath over 0.08, which was the conviction for which defendant was sentenced. Defendant attempts to argue *Relerford* allows for a review of the unsentenced convictions, but *Relerford* made it clear that, at most, all this court could do is remand to impose a sentence on the lesser convictions if warranted. This court could not review the sufficiency of the evidence. See *Jamison*, 2018 IL App (1st) 160409, ¶¶ 33, 37; *People v. Cabell*, 2023 IL App (2d) 220238-U, ¶ 18.

¶ 52         As for the conviction for which defendant was sentenced, although defendant argues trial counsel was ineffective for failing to provide evidence of the margin of error for the Breathalyzer, he does not argue the evidence was insufficient to show his breath-alcohol content was 0.08 or more, and any such argument has been forfeited as a result. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (stating that points not argued are forfeited).

¶ 53         Forfeiture aside, we note the State is not required to prove that a test result exceeds 0.08 by the allowable margin of error for admissibility of the test results. *People v. Robledo*, 2018 IL App (2d) 151142, ¶ 17. Instead, the reliability of the device and any effect of its being subject to error is a matter a defendant may raise for the jury to consider when determining the weight afforded to the evidence. See *id.* ¶ 14.

¶ 54                              B. Ineffective Assistance of Counsel

¶ 55         Defendant argues he was provided ineffective assistance of defense counsel because counsel failed to (1) introduce evidence that the Breathalyzer result was subject to a margin of error, (2) challenge Lang's administration of the HGN test, (3) elicit testimony from Lang that defendant was not slurring his words, and (4) call the other officer who spoke to defendant at the scene and did not smell alcohol on defendant's breath. We disagree.

¶ 56                              1. *The Applicable Law*

¶ 57         "To demonstrate ineffective assistance of counsel, a defendant must show that (1) the attorney's performance fell below an objective standard of reasonableness and (2) the attorney's deficient performance prejudiced the defendant in that, absent counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *People v. Jackson*, 2020 IL 124112, ¶ 90 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "A reasonable probability is a probability which undermines confidence in the

outcome of the trial." *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 84. "Because the defendant must satisfy both prongs of this test, the failure to establish either is fatal to the claim." *Jackson*, 2020 IL 124112, ¶ 90 (citing *Strickland*, 466 U.S. at 697).

¶ 58　　　　　Under the first prong, counsel is afforded wide latitude when making tactical decisions, and the law presumes counsel will faithfully fulfill his or her role envisioned by the sixth amendment (U.S. Const., amend. VI). *Strickland*, 466 U.S. at 688-89. Hence, counsel's assistance must fall "outside the wide range of professionally competent assistance," considering all the circumstances. *Id.* at 690. Further, choices of trial strategy are virtually unchallengeable because such a choice "is a matter of professional judgment to which a review of a counsel's competency does not extend." *People v. Cundiff*, 322 Ill. App. 3d 426, 435 (2001); see *Strickland*, 466 U.S. at 690. "Trial strategy includes an attorney's choice of one theory of defense over another." *People v. Campbell*, 264 Ill. App. 3d 712, 732 (1992).

¶ 59　　　　　　　　　　　　　2. *This Case*

¶ 60　　　　　　　　　a. Defendant's Actual Impairment Claims

¶ 61　　　　　Regarding defendant's claims that defense counsel was ineffective for failing to adequately challenge evidence of defendant's actual impairment—namely, Lang's observations during the traffic stop—we conclude that defendant cannot show he was prejudiced by counsel's representation. As we previously noted (*supra* ¶¶ 46-51), the charges alleging actual impairment merged into a single conviction of aggravated DUI with an alcohol concentration in the blood or breath over 0.08.

¶ 62　　　　　Section 11-501(a)(1) of the Illinois Vehicle Code (625 ILCS 5/11-501(a)(1) (West 2022)) is a strict-liability offense and does not require proof of impairment. See *People v. Martin*, 2011 IL 109102, ¶ 26. Because defendant was convicted and sentenced under section 11-501(a)(1),

evidence from the HGN test and other signs of impairment, or lack thereof, was simply not relevant or necessary to obtain a conviction. Therefore, even if we were to find counsel's performance fell below an objective standard of reasonableness, defendant was not prejudiced because he was not sentenced on the charges alleging actual impairment.

¶ 63                                  b. The Margin of Error of the Breathalyzer Test

¶ 64        Defendant also argues that defense counsel was ineffective for failing to provide evidence of the margin of error of the Breathalyzer test. As part of his argument, he claims that a Breathalyzer test can have up to a 10% margin of error, citing statutes and regulations regarding the Breathalyzer's evidentiary use.

¶ 65        We first note that defendant has never raised the admissibility of the Breathalyzer test as an issue. Instead, on appeal, defendant challenges only the evidence of its reliability, which is a question of fact for the jury. See *Robledo*, 2018 IL App (2d) 151142, ¶ 14.

¶ 66        The regulatory scheme provides that Breathalyzer results are admissible when administered in compliance with administrative regulations. Those regulations provide a rebuttable presumption that a testing instrument was accurate when certain conditions were met, including that the instrument was "within the accuracy tolerance" and "[a]ccuracy checks have been done in a timely manner, meaning not more than 62 days have passed since the last accuracy check prior to the subject test." 20 Ill. Adm. Code 1286.200 (2009). The regulations further provide that "[a]pproved evidentiary instruments must quantitate the reference sample within 10 percent of the reference sample's value, as adjusted for environmental factors, to be certified accurate." 20 Ill. Adm. Code 1286.220 (2011). For purposes of admissibility, the margin of error is accounted for in the regulatory scheme. See *People v. Cady*, 311 Ill. App. 3d 348, 353 (2000).

¶ 67        Although a sample that is certified accurate is admissible, the defendant may still

attack its reliability and the weight the jury should give to the test result. See *People v. Bonutti*, 212 Ill. 2d 182, 191 (2004); *Robledo*, 2018 IL App (2d) 151142, ¶¶ 14, 18; *People v. Weidner*, 2014 IL App (5th) 130022, ¶ 18. Thus, defendant was allowed to and did attack the accuracy of the 0.082 result. One way defendant suggests counsel was ineffective was by failing to cross-examine witnesses about, or provide evidence of, the Breathalyzer's margin of error. See *Robledo*, ¶ 18 (noting the jury heard evidence the individual Breathalyzer machine had a margin of error of 0.005).

¶ 68          Although these regulations show a Breathalyzer could have up to a 10% margin of error between the reference sample's known value and the quantitation of that sample and be certified accurate, the record does not contain any evidence showing that the margin of error of the particular Breathalyzer used here was anywhere near that number.

¶ 69          The only evidence defendant points to in the record regarding the margin of error of the Breathalyzer test used on him is the calibration result, which showed a difference of only 0.001 between the 0.078 target and 0.079 result. Notably, that difference is not large enough, if considered as the margin of error of the specific Breathalyzer used on that occasion, to lower the result below 0.080. Further, defendant's argument that defense counsel's closing argument, in which counsel noted the inconsistency between the calibration result and defendant's test result, would have been stronger had he introduced evidence of the margin of error of the Breathalyzer test presumes that additional evidence of the margin of error would have been *beneficial* to him. However, we simply do not know if that is true.

¶ 70          It is just as likely that counsel knew the margin of error was not sufficient to make a difference and deliberately chose not to tuckpoint the State's case. By not answering the question definitively for the jury, counsel was able to raise a strong argument that the State failed to meet

its burden of proof.

¶ 71 Indeed, hammering the accuracy and reliability of the test could have been detrimental to his defense. In addition, the jury's question about the calibration of the test, contrary to defendant's argument, does not necessarily lead to a conclusion that more information about the test's accuracy would have accrued to defendant's advantage. The question shows merely that the evidence, as presented, gave the jury some pause over what conclusions to draw from it.

¶ 72 We emphasize that "[j]udicial review of counsel's performance is highly deferential." *People v. Bates*, 2018 IL App (4th) 160255, ¶ 47. The following four presumptions are baked into that deference:

> "First, we presume that counsel's actions or inactions are the product of sound trial strategy. [Citation.] Second, we presume that counsel knew the law and how to apply it. [Citation.] Third, we presume that counsel fully investigated potential defenses and knew the facts of the defendant's case. [Citation.] Fourth, we presume that counsel's actions and representations in the trial court were ethically sound." *People v. Morrow*, 2024 IL App (4th) 230617-U, ¶ 51.

¶ 73 None of these presumptions is refuted by the record. In the absence of other information showing that counsel's representation was deficient, the presumption of adequate counsel stands, and defendant's claim fails.

¶ 74                    C. *Krankel* Claims

¶ 75 Defendant next contends that the trial court erred by failing to appoint conflict counsel after completing its preliminary *Krankel* inquiry. He argues the record shows trial counsel possibly neglected his case by failing to (1) introduce evidence of the margin of error of the Breathalyzer, (2) challenge the administration of the HGN test, and (3) elicit testimony defendant

did not slur his words or have an odor of alcohol on his breath. In the alternative, he argues the court failed to conduct an adequate inquiry into whether counsel possibly neglected the case by failing to investigate or provide evidence of the effect of defendant's acid reflux on the result of the Breathalyzer test.

¶ 76                                     1. *The Applicable Law*

¶ 77        A *pro se* posttrial claim alleging ineffective assistance of counsel is governed by the common law procedure developed by the supreme court in *Krankel* and its progeny. *People v. Roddis*, 2020 IL 124352, ¶ 34. "The procedure encourages the trial court to fully address these claims and thereby narrow the issues to be addressed on appeal." *Id.* Under this procedure, the court does not automatically appoint new counsel when a defendant alleges ineffective assistance of counsel; rather, the court first examines the factual basis of the defendant's claim. *Id.* ¶ 35. "Specifically, the trial court must conduct an adequate inquiry ***, that is, inquiry sufficient to determine the factual basis of the claim." (Internal quotation marks omitted.) *People v. Ayres*, 2017 IL 120071, ¶ 11. In doing so, the court considers the merits of the defendant's allegations in their entirety. *Roddis*, 2020 IL 124352, ¶ 61.

¶ 78        If the trial court determines the claims lack merit or pertain only to matters of trial strategy, the court need not appoint new counsel and may deny the defendant's *pro se* claims. *Id.* ¶ 35. "However, if the allegations show possible neglect of the case, new counsel should be appointed." *Id.* Doing so permits new counsel to independently evaluate the defendant's claims, while avoiding the conflict of interest trial counsel would otherwise have, and new counsel would represent the defendant at a hearing on the *pro se* ineffective assistance of counsel claims. *Id.* ¶ 36.

¶ 79        Whether a trial court properly conducted a preliminary *Krankel* inquiry presents an issue we review *de novo*. *People v. Jolly*, 2014 IL 117142, ¶ 28. However, we review a trial court's

decision declining the appointment of new counsel following an adequate inquiry for manifest error. *People v. McCarter*, 385 Ill. App. 3d 919, 941 (2008). "Manifest error is that which is 'clearly evident, plain, and indisputable.' " *People v. Johnson*, 206 Ill. 2d 348, 360 (2002) (quoting *People v. Ruiz*, 177 Ill. 2d 368, 384-85 (1997)).

¶ 80 A trial court's method of inquiry at a preliminary *Krankel* proceeding is flexible. *People v. Flemming*, 2015 IL App (1st) 111925-B, ¶ 85.

> "A reviewing court should consider three factors when determining whether a *Krankel* inquiry was sufficient: (1) whether there was some interchange between the trial court and defense counsel regarding the facts and circumstances surrounding the allegedly ineffective representation, (2) the sufficiency of defendant's *pro se* allegations of ineffective assistance, and (3) the trial court's knowledge of defense counsel's performance at trial and the sufficiency of the defendant's allegations on their face." *People v. Schnoor*, 2019 IL App (4th) 170571, ¶ 71.

¶ 81 "None of these factors are mandatory, and no bright-line rule exists about what is a sufficient inquiry and what is not." *Id.* "The Illinois Supreme Court specifically used permissive rather than mandatory language in describing the utilization of these factors." *Id.*

¶ 82 2. *This Case*

¶ 83 a. Declining To Appoint New Counsel

¶ 84 As an initial matter, we note that defendant asserts the trial court erred by not appointing new counsel based on the same grounds he argues on appeal that trial counsel was ineffective—namely, counsel's failure to present evidence (1) informing the jury of the margin of error, (2) challenging the HGN test, and (3) emphasizing defendant did not slur his speech or smell

of alcohol. For the reasons we set forth earlier (*supra* ¶¶ 61-73), we concluded defendant's claims of ineffective assistance lacked merit or pertained to matters of trial strategy. Accordingly, the trial court did not err by declining to appoint new counsel at the *Krankel* hearing on those claims.

¶ 85                                    b. Conducting an Adequate Inquiry

¶ 86            In the alternative, defendant argues the trial court failed to conduct an adequate inquiry into whether counsel possibly neglected the case by failing to investigate or provide evidence of the effect of defendant's acid reflux on the result of the Breathalyzer test.

¶ 87            In *Bonutti*, 212 Ill. 2d at 189, the State argued the Administrative Code required only an observation of vomiting to make a test inadmissible. However, the supreme court noted reliability was a separate issue. *Id.* at 191. The court affirmed a determination of the trial court that the results of a Breathalyzer test were unreliable when the defendant presented evidence from his personal physician that he suffered from an acid reflux disorder and defendant confirmed he suffered an incident of it during the testing observation period. *Id.* at 191-92.

¶ 88            In this case, the trial court allowed defendant to speak at length about his concerns regarding counsel's representation, including defendant's concerns about the effect of acid reflux on the result of the Breathalyzer test. Although the court did not specifically address the matter or ask counsel about the issue, it did engage in a back-and-forth discussion with defense counsel and allowed counsel ample time to respond to defendant's claims before concluding they lacked merit.

¶ 89            We note the record does not reflect that defendant could show acid reflux affected his test. Defendant testified at trial that he suffered acid reflux during the first observation period and he drank water from a faucet. But, because defendant had been placed in a cell where he was not fully observed, a second observation period was conducted. Defendant did not allege he suffered from acid reflux during that period. It was the second period that was relevant to test.

Defendant also provided nothing to show he could prove he had a medical condition causing acid reflux, such as was seen in *Bonutti*.

¶ 90　　　　　Given that the trial court heard defendant's argument on the issue and the lack of evidence that defendant had acid reflux during the second observation period, we conclude the court conducted a proper inquiry into the matter and did not err by declining to appoint counsel.

¶ 91　　　　　　　　　D. Certification for Waiver of Assessments

¶ 92　　　　　Last, defendant argues counsel rendered ineffective assistance by failing to certify defendant was eligible for a waiver of assessments because he received SNAP benefits. The State agrees. However, we do not accept the State's concession of error.

¶ 93　　　　　Section 124A-20(b) of the Code of Criminal Procedure of 1963 (725 ILCS 5/124A-20(b) (West 2022)) provides that a defendant convicted of a criminal offense may apply for a waiver of assessments no later than 30 days after imposition of his or her sentence. "If the court finds that the applicant is an indigent person, the court shall grant the applicant a full assessment waiver exempting him or her from the payment of any assessments." *Id.* § 124A-20(b)(1). Under section 124A-20(a)(1), a person is indigent if he or she is receiving assistance under SNAP. *Id.* § 124-20(a)(1).

¶ 94　　　　　However, "assessments" are defined as "any costs imposed on a criminal defendant under Article 15 of the Criminal and Traffic Assessment Act [(705 ILCS 135/art. 15 (West 2022))], *but does not include violation of the Illinois Vehicle Code assessments except in a county having a population of more than 3,000,000*." (Emphasis added.) *Id.* § 124A-20(a).

¶ 95　　　　　In this case, the trial court imposed a criminal assessment for defendant's DUI conviction, which was an offense charged under the Illinois Vehicle Code. See 705 ILCS 135/15-10 (West 2022) (schedule 2, assessments for felony DUI). The definition of "assessments"

specifically states it does not include violation of the Illinois Vehicle Code assessments except in a county having a population of more than 3 million. 725 ILCS 5/124A-20(a) (West 2022). We take judicial notice that Cook County is the only county in this state that has a population of over 3 million. *People v. Lovelace*, 2018 IL App (4th) 170401, ¶ 69. Because defendant's offense took place in Henry County, he was not eligible for a waiver of the assessment for his DUI conviction.

¶ 96    We note that the trial court did not impose an assessment for defendant's driving while his license was revoked conviction. Accordingly, counsel did not render ineffective assistance when he did not file a certification seeking waiver of an assessment defendant was not entitled to receive.

¶ 97                                III. CONCLUSION

¶ 98    For the reasons stated, we affirm the trial court's judgment.

¶ 99    Affirmed.