NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 241205-U

NO. 4-24-1205

IN THE APPELLATE COURT

FILED
March 2, 2026
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| ANTHONY SAMUEL GRAMPSAS, | ) | No. 19CF15 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | William A. Yoder, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court.
Justices Zenoff and Knecht concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed the judgment of the trial court dismissing
defendant's postconviction petition at the second stage of postconviction
proceedings because defendant did not make a substantial showing of a
constitutional violation.

¶ 2    In July 2020, a jury found defendant guilty of first degree murder (720 ILCS 5/9-1(a)(3) (West 2018)) and home invasion (*id.* § 19-6(a)(3)) following the December 2018 shooting death of Egerton Dover during a robbery at his home. In September 2020, the trial court sentenced defendant to 45 years in prison. This court affirmed defendant's conviction and sentence on direct appeal. *People v. Grampsas*, 2022 IL App (4th) 200577-U, ¶ 2.

¶ 3    In June 2023, defendant filed a petition for relief pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)), and in February 2024, the State filed a motion to dismiss defendant's petition. In August 2024, following a hearing on the State's

motion, the trial court dismissed defendant's postconviction petition.

¶ 4    Defendant appeals, arguing the trial court erred by dismissing his postconviction petition because he made a substantial showing that (1) his rights to a fair trial and due process were violated when the court barred as unreliable the testimony of Tyshon Fanning regarding out-of-court statements by Tyjuan Bruce and Curtis Hairston but allowed Fanning's testimony regarding statements by Bruce at Bruce's subsequent trial, (2) he was actually innocent based upon new evidence from three witnesses that he was not at the crime scene and had no knowledge of the plan to rob Dover, and (3) his trial counsel rendered ineffective assistance by failing to object to voluminous firearms evidence that was unconnected to the crime or defendant.

¶ 5    We disagree and affirm.

¶ 6                        I. BACKGROUND

¶ 7                 A. The Charges and the Jury Trial

¶ 8    In January 2019, the State charged defendant with first degree murder (counts I-IV) (720 ILCS 5/9-1(a)(3) (West 2018)), home invasion (count V) (*id.* § 19-6(a)(3)), armed robbery (count VI) (*id.* § 18-2(a)(2)), robbery (count VII) (*id.* § 18-1(a)), and residential burglary (count VIII) (*id.* § 19-3(a)). The charging documents asserted, generally, that defendant or one for whose conduct he was legally responsible caused Dover's death while committing a forcible felony while armed with a firearm—namely, home invasion (count I), armed robbery (count II), robbery (count III), and residential burglary (count IV).

¶ 9    In January 2020, the trial court conducted defendant's jury trial. (We note that the State proceeded to trial only on counts I, III, V, and VI, which charged first degree murder involving home invasion, first degree murder involving robbery, home invasion, and robbery.)

¶ 10 The State's theorized at trial that, although Hairston was the likely shooter, defendant was guilty under an accountability theory because he (1) was part of a conversation with Hairston and Bruce during which the plot to rob Dover was developed, (2) left with Hairston and Bruce shortly thereafter, (3) provided the car that transported Hairston and Bruce to Dover's home, (4) changed the tires on that car after the shooting, and (5) stated in a recorded phone call that he was present for the shooting.

¶ 11 1. *The State's Evidence*

¶ 12 The State introduced the following evidence. (The following summary of the trial evidence is obtained from this court's previous recitation of the trial evidence in this case on direct appeal. See *Grampas*, 2022 IL App (4th) 200577-U, ¶¶ 5-56.)

¶ 13 a. The Crime Scene

¶ 14 On December 5, 2018, at around 4:45 a.m., members of the Bloomington Police Department were dispatched to Dover's home at 816 West Jefferson Street in Bloomington, Illinois, following a report of a shooting. Police officers discovered that Dover's door had been kicked in and he had been shot and killed. A forensic scientist determined that Dover had been shot three times. One bullet was recovered from his body; the other two bullets had passed completely through his body and were not recovered.

¶ 15 At the scene, police officers recovered (1) three spent cartridge cases (two .380-caliber cartridge cases and one 9-millimeter cartridge case), (2) a fired bullet fragment and fired bullet, and (3) marijuana. However, they found no fingerprints at any of the entry points and never located any of the firearms used during the shooting.

¶ 16 Outside of the home, police discovered more than one set of footprints going around the residence, as well as vehicle tire tracks in the street.

¶ 17        b. Dover's Activity Prior to His Murder

¶ 18   Luis Rodriguez testified that on the evening of December 4, 2018, he dropped Dover and Blake Dunn off at the Lancaster Heights apartment complex in Normal, Illinois. Sometime later, he picked up Dover, Dunn, and Alex Williams from the same apartment complex and took them to Dover's house. After taking his girlfriend to work, Rodriguez drove Dover, Dunn, and Williams to a house in Champaign, Illinois. Thirty to forty minutes later, Rodriguez drove them back to Lancaster Heights. Rodriguez and Dunn stayed in the car; Dover and Williams got out but returned to the car about 10 minutes later. The four men then returned to Dover's house. Later, Rodriguez, Dunn, and Dover began driving to El Paso, Illinois, but turned around and dropped Dover off at his house around 3:15 a.m.

¶ 19   c. The Events at Hannah Newble's Apartment Prior to Dover's Murder

¶ 20        i. *Newble*

¶ 21   Hannah Newble testified that she lived in an apartment at Lancaster Heights on December 4, 2018. That evening, several people were at her apartment, including defendant, Bruce, Koebe Harris, Demarius Young, and a male she did not know. Around midnight, Dover and Williams arrived. Dover and Newble were alone in the kitchen when Dover gave her a gram of marijuana. Newble asked him to leave because she did not feel comfortable with Dover being around the other people who were present. Williams left shortly after he realized Dover had left. According to Newble, neither Dover nor Williams returned to her apartment that night.

¶ 22   A few minutes after Dover left, some of the other people still in the apartment began looking for Dover. According to Newble, the mood in the apartment changed. Bruce began complaining about Dover's leaving, saying Dover did not want to show his marijuana for fear the others would take it. Defendant and Harris were present for these complaints, during

which Bruce stated that he wanted to rob Dover.

¶ 23        Newble told the men that Dover was her friend and asked them to leave. Defendant, Bruce, Harris, and the male she did not know all left together. She saw that defendant had car keys. None of the men returned to her apartment that night. Newble learned the next morning that Dover had been killed.

¶ 24                            ii. *Young*

¶ 25        Young testified that Dover and Williams came to Newble's apartment when Young, Bruce, and Newble were present. Young and Bruce were staying at Newble's apartment at the time. Dover and Williams said they were going to Champaign to get marijuana and they would be back. After they left, other people started showing up at the apartment.

¶ 26        Later in the night, after various people came and went, defendant, Bruce, Harris, Young, Newble, and Dylan Messerole were present when Dover and Williams returned from their trip to get marijuana. Dover gave Newble some marijuana but did not sell or give marijuana to anyone else. Newble asked Dover to leave, and he did. Williams also left after about five minutes. Sometime later, defendant and Harris took Messerole home, then later returned to the apartment with Hairston. Hairston showed Young a video of himself robbing Messerole of his gun; Young recognized the background of the video to be the bathroom of Newble's apartment.

¶ 27        Later, defendant, Bruce, Hairston, Harris, Young, and Newble were present in the apartment when the conversation turned to robbing Dover. Around 4 or 4:30 a.m., defendant, Bruce, Hairston, and Harris left the apartment together and did not return. Young learned the next day that Dover had been killed.

¶ 28                            iii. *Messerole*

¶ 29        Messerole testified that when he arrived at Newble's apartment, Newble, Bruce,

and Young were present. Other people, including defendant, Harris, and Hairston arrived later. While there, Hairston took Messerole's gun, which was a 9-millimeter Taurus handgun. Dover and Williams arrived but only stayed for 10 to 15 minutes. Defendant and Harris gave Messerole a ride home at around 3 a.m.; defendant drove the car.

¶ 30                                    d. After the Shooting

¶ 31                            i. *Evidence Relating to the Toyota Camry*

¶ 32          Police officers obtained surveillance video showing a gray Toyota Camry with what appeared to be a bubble mirror near Dover's home shortly before the shooting. The local newspaper published photos of the crime scene on December 5 or 6, 2018, which showed the footprints and tire marks.

¶ 33          On December 13, 2014, the police seized defendant's grandmother's gray Toyota Camry, which also had an aftermarket bubble mirror. The next day, police officers examined the tires on the Camry and determined it had nonmatching tires. The tires on the Camry did not match the tire tracks left at the crime scene, which all appeared to have been made by the same type of tire.

¶ 34          Nonetheless, police officers spoke with the owner of Custom Auto Sales, Peter Hettinger, who had sold defendant's grandmother the Camry in July 2018. Before selling her the car, Hettinger had taken the Camry to Don Owen Tire in Bloomington, where he had four new Firestone 215/60R16 tires placed on the car. Police officers obtained impressions from that type of Firestone tire and determined they were consistent with the tracks left at the crime scene.

¶ 35                                 ii. *Firearms Evidence*

¶ 36          Police officers also attempted to locate the weapons used in Dover's murder. At Newble's apartment, they located two BB guns that looked like handguns and a .25-caliber

- 6 -

handgun. At Bruce's residence, they found a magazine speed loader, a state identification (ID) card for Bruce, a .22-caliber Colt rifle, cartridge cases, and empty ammunition boxes. In a camper at the same address, they found a gun magazine, a Taurus .40-caliber handgun, and a Glock .45-caliber handgun. At defendant's residence, police found a handgun magazine partially loaded with 9-millimeter cartridges, a partial box from a laser sight for a firearm, a temporary ID card for Bruce, and a state ID card for defendant.

¶ 37     The State also presented evidence that a week before the murder, photos of a Hi-Point .380-caliber handgun were posted on Hairston's Facebook account, and on the night of the murder at around midnight, a video showing Hairston, Harris, and defendant was posted on Hairston's Snapchat account. Another video showed Hairston holding up two guns, and in another video two guns could be seen, including a Hi-Point .380-caliber and a G2 Taurus 9-millimeter.

¶ 38     Hairston was killed at a restaurant on January 9, 2019. Two handguns—a Taurus PT 111 9-millimeter and a Taurus PT 111 Pro 9-millimeter—were found at the restaurant.

¶ 39     Dustin Johnson, a forensic scientist employed at the Illinois State Police Morton Forensic Science Laboratory, testified that the two guns found at the restaurant did not fire the .380-caliber cartridge cases that were found at the scene. Johnson determined that the two .380-caliber cartridge cases were fired by the same gun, and the three bullets/bullet fragments he was asked to examine (recovered from the scene and from Dover's body) all had the same lands, grooves, and twists unique to a .380-caliber Hi-Point firearm.

¶ 40                    iii. *Defendant's Admission*

¶ 41     The State presented a recorded phone call defendant placed to an unidentified female when he was incarcerated at the McLean County jail while awaiting trial. During that

call, defendant told the female he "just happened to be there whenever it went down."

¶ 42                    2. *Defendant's Evidence and Offer of Proof*

¶ 43        Defendant did not testify on his own behalf but called a total of five witnesses—Doni Jo Tornowski, N'Dia Montgomery, Mark Foster, Fanning, and Anna Legner. For the purposes of this appeal, we discuss only the testimony of Tornowski and Fanning.

¶ 44                    a. Tornowski

¶ 45        Tornowski testified that she was Harris's mother, and she knew defendant and was familiar with his voice. On December 5, 2018, she had set an alarm for 4:45 a.m. because she needed to be at work by 6 a.m. At some time before her 4:45 alarm went off, she woke up and heard Harris enter the house and walk upstairs. She also heard Harris and defendant talking downstairs. She did not know what time this occurred, other than sometime before 4:45 a.m. She did not hear anyone leave. When she left for work at 5:50 a.m., she saw her son in his room but did not see defendant.

¶ 46                    b. Fanning's Offer of Proof

¶ 47        Defendant sought to introduce, pursuant to Illinois Rule of Evidence 804(b)(3) (eff. Jan. 1, 2011), the testimony of Fanning regarding hearsay statements allegedly made by Hairston and Bruce to Fanning about three and a half weeks after Dover's murder. The trial court found that both Bruce and Hairston were unavailable to testify pursuant to Rule 804 because (1) Bruce had invoked his fifth amendment (U.S. Const., amend. V) right not to testify and (2) Hairston was no longer alive.

¶ 48        Fanning testified outside the presence of the jury that he spoke to defendant, Bruce, and Hairston at a New Year's Eve party in 2018. Fanning, who was 18 years old at the time of his testimony, had known defendant for about three years and had just met Bruce and

Hairston shortly before the party. Fanning was not close with any of them.

¶ 49　　　　At the party, Hairston brought up Dover's shooting and explained it was supposed to be a robbery, but Dover started wrestling with him, causing Hairston's gun to fall. Hairston retrieved the gun and shot Dover. Bruce said he was also at the scene. Neither Hairston nor Bruce said anything about where defendant was when the shooting occurred. Defense counsel asked if they said anything about "dropping him off and picking him up," and Fanning answered, "Like they—it be—like, I don't know. Like he didn't say, like, specifically, like, where they dropped him off at, if that's what you [*sic*] asking. But they explained how he wasn't with them."

¶ 50　　　　Defense counsel tried again, asking, "Did they indicate *** what they believed [defendant] thought they were doing when they dropped him off some place?" Fanning answered, "No. They explained how—like, they didn't—I don't know what they explained specifically, but I just know that they wasn't—they didn't tell them, like, what they was going to do."

¶ 51　　　　Fanning also testified that he had a separate conversation with Hairston, during which Hairston told him again that they went to Dover's to commit a robbery and Hairston shot Dover.

¶ 52　　　　After Fanning's offer of proof, the trial court ruled that Fanning could not testify about what Bruce and Hairston told him. The court observed that, pursuant to *People v. Tenney*, 205 Ill. 2d 411 (2002), an unavailable declarant's unsworn, out-of-court statement that he committed a crime that a defendant is charged with committing is inadmissible at that defendant's trial.

¶ 53　　　　The court noted the limited exception set forth in *Chambers v. Mississippi*, 410 U.S. 284, 300-01 (1973), which permits the admission of otherwise inadmissible declarations

against penal interest if the statements were made under circumstances providing considerable assurance of the statements' reliability. However, after considering the relevant factors set forth in *Chambers*,—namely, whether (1) the statement was made spontaneously to a close friend or relative shortly after the crime occurred, (2) the statement was corroborated by other evidence in the case, (3) the statement was self-incriminating and against the declarant's interest, and (4) the declarant was available for cross-examination (*id.*)—the court determined that Bruce's and Hairston's out-of-court statements to Fanning were not made under circumstances providing considerable assurance of their reliability. The court noted that (1) the statements to Fanning were not spontaneous and Fanning was not a close friend or relative to Bruce or Fanning, (2) the statements were not corroborated by any other evidence in the case, and (3) Bruce and Hairston were unavailable for cross-examination about the statements attributed to them.

¶ 54        After the trial court barred Fanning from testifying about Bruce's and Hairston's statements, Fanning testified before the jury that he had previously seen defendant loan out his car to others.

¶ 55                      3. *The Verdict and Sentencing*

¶ 56        The jury found defendant guilty of (1) first degree murder involving home invasion and (2) home invasion. The jury also found that defendant or one for whose conduct he was legally responsible was armed with a firearm. In September 2020, the trial court sentenced defendant to 45 years in prison, and in November 2020, the court denied defendant's motion to reduce his sentence.

¶ 57                      B. The Direct Appeal

¶ 58        In 2020, defendant appealed, arguing that (1) the State failed to prove him guilty beyond a reasonable doubt, (2) the trial court erred by barring Fanning from testifying about

Bruce's and Hairston's out-of-court statements, and (3) the court erred by admitting evidence of firearms unconnected to Dover's murder. The appellate court affirmed defendant's conviction and sentence. *Grampsas*, 2022 IL App (4th) 200577-U, ¶ 2.

¶ 59                                C. The Postconviction Proceedings

¶ 60                                1. *The Amended Petition*

¶ 61        In June 2023, defendant, through counsel, filed an "Amended Verified Petition for Post-Conviction Relief" pursuant to the Act, which is the subject of this appeal. Defendant asserted three postconviction claims: (1) his right to due process was violated when the State successfully moved to bar Bruce's and Hairston's out-of-court statements to Fanning as unreliable, then later presented Fanning's testimony about Bruce's same statements at Bruce's own jury trial; (2) defendant was actually innocent based upon "new evidence" from three witnesses; and (3) trial counsel rendered ineffective assistance by failing to object to the "voluminous firearms evidence" introduced by the State that "was unconnected to the crime and defendant."

¶ 62        a. The State's Use of Bruce's Statements at Bruce's Trial

¶ 63        Defendant alleged that his right to due process was violated because the State (1) successfully moved to bar Fanning's testimony about Bruce's and Hairston's statements at the New Year's Eve party on the grounds that they were unreliable, then (2) at Bruce's own jury trial, presented Fanning's testimony about those same statements by Bruce and obtained a conviction for Bruce.

¶ 64        Defendant attached to his petition a portion of the transcript of Fanning's testimony at Bruce's trial. During direct examination by the prosecutor, Fanning testified as follows regarding his conversation with Bruce at the New Year's Eve party:

"Q. *** With respect to this party and conversation, did [Bruce] ever give or make any statements about what actually led up to the situation involving [Dover]?

A. Yes.

Q. And what specifically did he tell you or did he say about Egerton Dover and what occurred inside the house?

A. How, how it was supposed to be a robbery.

* * *

Q. And when [Bruce] made the statement about this [robbery] to [Dover], did he indicate who it was who was essentially setting up the [robbery]?

A. He—it was implied that it was him.

Q. Okay. Did he provide any additional information about who was with him at the time that this robbery occurred?

A. Yes.

Q. And who did he indicate to you was with him at the time this robbery occurred?

A. The—his name is Curtis [Hairston].

* * *

Q. Okay. Did [Bruce] provide any information about anybody else who was there besides just him and Mr. Hairston?

A. No.

Q. Did [Bruce] indicate what the purpose of the robbery was, what they were attempting to obtain as a result of the robbery?

- 12 -

A. Drugs."

¶ 65 Defendant argued in his postconviction petition that (1) the barring of Bruce's and Hairston's out-of-court statements at defendant's trial as unreliable and (2) the subsequent use of Bruce's same statements at Bruce's own trial created a "fatal contradiction" that "must be corrected."

¶ 66          b. Actual Innocence

¶ 67 Defendant also asserted an actual-innocence claim based upon "new evidence" from (1) Tornowski, (2) Harris, and (3) Kemondre King.

¶ 68          i. *Tornowski*

¶ 69 Defendant alleged that Tornowski had testified at defendant's trial that she heard defendant and Harris "talking in the early morning hours of December 5, 2018," but the question remained "at precisely what time she heard them talking." Defendant further claimed as follows:

>"Now, Tornowski has come forward so that there can be no question
>
>whatsoever as to when she heard the boys talking. Recently, she took time to
>
>review her testimony. [Citation.] While her testimony [at trial] suggested she was
>
>not positive as to exactly when she awoke on December 5, 2018, she now does
>
>because her memory has been jogged. Tornowski owned a dog at the time of the
>
>incident. [Citation.] Whenever a car came near the home, without exception, her
>
>dog barked in such a manner that she awoke. She recalls that her dog barked after
>
>4:30 a.m. and woke her up that morning. [Citation.] That is when she heard
>
>[defendant] and [Harris] talking in normal conversational tones for about 10-15
>
>minutes."

Defendant asserted that because Dover was shot between 4:38 a.m. and 4:40 a.m., her new

recollection created "no possibility that Defendant was at the crime scene."

¶ 70    Defendant attached to his petition an affidavit by Tornowski, averring as follows:

"3. For the first time very recently, I reviewed my testimony from the trial. I believe that important, relevant, and accurate information was left out of my testimony. That is because I was not asked the questions that would have allowed me to provide the important information I set forth below.

\* \* \*

8. When asked if I knew what time I awoke before my alarm went off, I said I did not know.

9. I said I did not know because I was not positive as to exactly what time I had woken up.

10. But what I do know is that if a car comes near my home and parks, my dog barks and I wake up when my dog barks.

11. My dog barked after 4:30 and woke me up that morning.

12. It was after that that I heard [defendant] and [Harris] talking in normal conversational tones for about 10-15 minutes.

13. I did not get to testify that [defendant] and [Harris] were talking in normal tones for 10-15 minutes after 4:30 a.m. on December 5, 2018."

¶ 71                                    ii. *Harris*

¶ 72    Defendant alleged that Harris did not testify at defendant's jury trial "because he believed that if he did testify, he would be prosecuted as a perpetrator in the case," but "now Harris has come forward" to explain that (1) defendant "had no involvement or knowledge whatsoever that Hairston and/or anyone had a plan to commit a crime or even confront [Dover]"

- 14 -

and (2) he was "with Defendant the entire evening and early morning."

¶ 73     Defendant attached to his petition an affidavit by Harris, stating as follows:

"2. *** I did not testify [at defendant's trial] because I believed that if I did testify, I would be prosecuted as a perpetrator in the case.

* * *

5. Only now do I realize that I should come forward. I am coming forward because it is the right thing to do.

6. I attended a party on the evening of December 4, 2018, into the morning of December 5, 2018, in Normal, Illinois. Many people were present, including but not limited to [defendant] and Curtis Hairston.

7. I did not hear anything at the party or at any time during the party that Hairston and/or anyone else planned to commit a crime against [Dover] or even confront him. Had I heard such a thing, I would have left.

8. In the early morning hours of December 5, 2018, I was present in a car driven by Hairston. [Defendant] was with me. I was in the car because I was going to be dropped off at my house in Bloomington.

9. Shortly after 4:30 a.m. on that date, [Hairston] dropped [defendant] and [me] off at my home located at 606 1/2 West Washington. [Defendant] had to use the bathroom.

10. [Defendant] and I entered my home. [Defendant] went to the bathroom.

11. At that time, [Hairston] came to the door and told me that he was going to drive to the store and would be right back.

12. There had been no discussion whatsoever at any time that evening, that morning or even before about [Hairston] going to the home of anyone, robbing anyone, confronting anyone and/or committing any crime against anyone, including [Dover] ***.

13. When [defendant] finished using the bathroom, we remained in my house talking for at least 15 minutes."

¶ 74                                         iii. *King*

¶ 75          Defendant also alleged that Kemondre King had now come forward with testimony about statements Hairston made to him two days after Dover's murder. Defendant attached an affidavit by King, which averred as follows:

"I was told by Hairston (a friend of mine *** [who] is now deceased) the following: While Curits and I were hanging out, smoking on Rainbow Ave. in Bloomington, he asked if I heard about what happened to [Dover]. He told me that before [Dover] died, he (Curtis) was in town at a party with [defendant] and [Harris] when the[y] took a gun from [Messerole] and ran out of the party with it. After [Messerole] left later, Curtis said he returned but the party was over, and because he left the party, he was the only one sober between him, [defendant] and [Harris], so he drove. They were going to Decatur, with another person present that he called "Little Bro"; he said they stopped by [Harris's] house with [defendant] and [Harris] going inside. With them taking too long, Curtis went to tell them he was going to the store to buy some marijuana blunts and that he'd return shortly. On the way to the store, he and Little Bro were passing [Dover's] place and Little Bro was reminded that [Dover] had multiple pounds of weed,

- 16 -

which he told Curtis about. Curtis said that it didn't seem like anyone was home, so they'd break in right then. He told me that [Dover] ran toward him as soon as he kicked the door in, so he shot [Dover] and quickly ran from the home. He confided in me this info about 2 days or so after it happened."

¶ 76                                        c. Ineffective Assistance of Trial Counsel

¶ 77        Defendant's third postconviction claim alleged ineffective assistance of trial counsel for counsel's failure to object to evidence of firearms unrelated to defendant or the crime. Specifically, defendant asserted that the State "repeatedly introduced weapon evidence unrelated to [Dover's] murder," including (1) photos of Hairston with a gun, (2) testimony that Hairston was shot to death and firearms were recovered at the scene, (3) testimony about Messerole having a gun, (4) testimony that weapons had been recovered from individuals who had been present at Newble's apartment, and (5) evidence that defendant "associated himself with people who possessed guns."

¶ 78        Defendant argued that the "excessive firearm evidence was not probative of Defendant's guilt," but served instead only to establish defendant's "common association with criminal activity." Defendant further asserted that, during trial, he asked counsel to object to the admission of "the evidence" but counsel told him the evidence would not harm defendant's case. Instead, defendant asserted, the firearm evidence was "overwhelming" and "seriously prejudiced" him because it permitted the jury to convict him "because of who he associated himself with."

¶ 79         2. *The Dismissal of Defendant's Amended Postconviction Petition*

¶ 80        In February 2024, the State filed a motion to dismiss defendant's amended postconviction petition, and in May 2024, the trial court conducted a hearing on the State's

motion. The court took the matter under advisement, and in August 2024, issued a nine-page written ruling dismissing defendant's petition.

¶ 81 Regarding defendant's due process claim, the trial court found the claim was barred by *res judicata*. Specifically, the court found as follows: (1) defendant's trial, at which Hairston's and Bruce's out-of-court statements were excluded because they did not fall within the hearsay exception outlined in *Chambers*, occurred in July 2020; (2) Bruce's own trial, at which Bruce's out-of-court statements were admitted as non-hearsay statements of a party opponent, occurred in August 2020; and (3) defendant's trial counsel filed his posttrial motion in September 2020 and a motion to reconsider the denial of that motion in November 2020. As a result, the court found, "The issue of hearsay evidence being refused in the current case but being admitted as non-hearsay in the Bruce trial could have been addressed, but was not, in post-trial motions and on direct appeal in this case."

¶ 82 Regarding defendant's actual-innocence claim, the trial court found that (1) Tornowski's and Harris's affidavits did not constitute newly discovered evidence and (2) King's affidavit, taken as true, was not of such a conclusive character that it would probably change the result on retrial because it "simply asserts[,] at best, information which would discredit, contradict, and impeach other witnesses."

¶ 83 Last, regarding defendant's ineffective-assistance-of-counsel claim, the trial court found that counsel's decision not to object to the firearms evidence at trial was a matter of trial strategy and, as a result, defendant had failed to demonstrate either deficient performance or prejudice resulting therefrom.

¶ 84 This appeal followed.

¶ 85 II. ANALYSIS

¶ 86 Defendant appeals, arguing that the trial court erred by dismissing his postconviction petition because he made a substantial showing that (1) his right to due process was violated when the court barred the testimony of Fanning regarding out-of-court statements by Bruce and Hairston as unreliable but allowed Fanning's testimony regarding statements by Bruce at Bruce's trial, (2) he was actually innocent based upon new evidence from three witnesses that he was not at the crime scene and had no knowledge of the plan to rob Dover, and (3) his trial counsel rendered ineffective assistance by failing to object to voluminous firearms evidence that was unconnected to the crime or defendant.

¶ 87 We disagree and affirm.

¶ 88 A. The Act

¶ 89 "The [Act] (725 ILCS 5/122-1 *et seq.* (West 2018)) is the statutory procedure by which a defendant can pursue a claim that his conviction or sentence was based on a substantial denial of his constitutional rights." *People v. Clark*, 2023 IL 127273, ¶ 38. A proceeding under the Act consists of three stages. *People v. Tate*, 2012 IL 112214, ¶ 9.

¶ 90 At the first stage, the trial court conducts its own review of the petition to determine if it states the gist of a constitutional claim. *People v. Allen*, 2015 IL 113135, ¶ 24. "If the postconviction petition is not summarily dismissed at the first stage, the proceedings move to the second stage." *People v. House*, 2021 IL 125124, ¶ 16.

¶ 91 At the second stage of postconviction proceedings, which the present case involves, counsel may be appointed to represent the petitioner (*id.* ¶ 17), and the State is permitted to file a motion to dismiss or an answer to the petition (*People v. Gaultney*, 174 Ill. 2d 410, 418 (1996)). To avoid dismissal, a defendant must set forth in his petition a substantial showing of a constitutional violation and attach any accompanying documentation. *House*, 2021

IL 125124, ¶ 17. At this stage, the "trial court must examine the legal sufficiency of the defendant's allegations taking all well-pleaded facts as true." *People v. Lucas*, 203 Ill. 2d 410, 418 (2002). "Upon a substantial showing of a constitutional violation, the petition must be advanced to the third stage, where the [trial] court conducts an evidentiary hearing." *People v. Brown*, 2017 IL 121681, ¶ 24. "Upon no showing, the petition should be dismissed." *Id.*

¶ 92 The dismissal of a postconviction petition at the second stage is reviewed *de novo*. *Id.*

¶ 93 B. This Case

¶ 94 1. *Defendant's Due-Process Claim*

¶ 95 Defendant argues that he made a substantial showing that his rights to due process, a fair trial, and to present a complete defense were violated when the State successfully barred out-of-court statements by Bruce and Hairston during defendant's trial but later utilized those same statements by Bruce at Bruce's own trial to obtain a conviction. We disagree.

¶ 96 a. The Applicable Law

¶ 97 "A defendant's right to a fair trial is a fundamental liberty interest secured by the sixth and fourteenth amendments to the United States Constitution [(U.S. Const., amends. VI, XIV)]." *People v. Peeples*, 205 Ill. 2d 480, 527 (2002). "A criminal defendant is [also] constitutionally guaranteed a meaningful opportunity to present a complete defense." *People v. Ramirez*, 2012 IL App (1st) 093504, ¶ 43 (citing U.S. Const. amends. VI, XIV; Ill. Const. 1970, art. I, § 8; *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006)).

¶ 98 "Hearsay *** is an out-of-court statement offered to establish the truth of the matter asserted, and it is generally inadmissible due to its lack of reliability unless it falls within an exception to the hearsay rule." *People v. Olinger*, 176 Ill. 2d 326, 357 (1997). Although a

hearsay exception exists for declarations against interest, that exception generally does not apply to a confession of criminal activity because such declarations " 'are often motivated by extraneous considerations and, therefore, are not as inherently reliable as statements against pecuniary or proprietary interest.' " *Tenney*, 205 Ill. 2d at 433 (quoting *Chambers*, 410 U.S. at 299-300). "Accordingly, an unsworn, out-of-court declaration that the declarant committed the crime, and not the defendant on trial, is generally inadmissible, even though the declaration is against the declarant's penal interest." *Id.* The Illinois Supreme Court has explained the rationale underlying this general rule as follows:

> "The practicality of this rule is obvious. General admission of such statements could seriously handicap the administration of justice in tempting everyone accused of crime to introduce perjured testimony that a third party, then deceased or beyond the jurisdiction of the court, had declared that he, and not the accused, had committed the crime. The rule is sound and should not be departed from except in cases where it is obvious that justice demands a departure." *People v. Lettrich*, 413 Ill. 172, 178 (1952).

¶ 99      The Illinois Supreme Court has stated that a departure from this general rule may occur when a statement against penal interest "bears persuasive assurances of trustworthiness and is critical to the accused's defense." *Tenney*, 205 Ill. 2d at 434 (citing *Chambers*, 410 U.S. at 302; *People v. Thomas*, 171 Ill. 2d 207, 215-16 (1996)). The United States Supreme Court, in *Chambers*, set forth four factors to help determine the reliability of a hearsay statement against penal interest: "(1) the statement was spontaneously made to a close acquaintance shortly after the crime occurred; (2) the statement is corroborated by some other evidence; (3) the statement is self-incriminating and against the declarant's interests; and (4) there was adequate opportunity

for cross-examination of the declarant." *Id.* at 435 (citing *Chambers*, 410 U.S. at 300-01).

¶ 100      Using these factors as a guide, but not a requirement, a court deciding the admissibility of statements against penal interest should determine whether the statements were "made under circumstances which provide[d] considerable assurance of [their] reliability by objective indicia of trustworthiness." (Internal quotation marks omitted.) *Id.*

¶ 101      The *Tenney* court further noted that "the holding in *Chambers* is narrow" and reiterated that "*Chambers* did not do away with the hearsay rule." (Internal quotation marks omitted.) *Id.* Instead, "[t]he Supreme Court [in *Chambers*] contemplated that the [trial] judge would be a gatekeeper, that unreliable statements could be excluded." (Internal quotation marks omitted.) *Id.* at 435-36. The *Tenney* court affirmed that that the admission of evidence would remain in the sound discretion of the trial court and its rulings would not be disturbed absent an abuse of that discretion. *Id.* at 436.

¶ 102      In contrast to the above, if the statement against penal interest, *i.e.*, criminal confession, is offered against the declarant at the declarant's own trial, the statement is not hearsay. See Ill. R. Evid. 801(d)(2)(A)(eff. Oct. 15, 2015) ("A statement is not hearsay if ***[t]he statement is offered against a party and is *** the party's own statement.") "The hearsay rule is not a basis for objection when the defendant's own statements are offered against the defendant; in such a case the defendant's statements are termed 'admissions.' " *People v. Aguilar*, 265 Ill. App. 3d 105, 110 (1994). "Any statement by an accused person, unless excluded by the privilege against self-incrimination or other exclusionary rules, may be used against him as an admission." *Id.*

¶ 103                          b. Application to This Case

¶ 104      We begin our analysis with the obvious distinction between the use of Fanning's

testimony at defendant's trial versus the use of Fanning's testimony at Bruce's trial. At defendant's trial, Fanning's testimony about Bruce's and Hairston's statements was hearsay, while at Bruce's trial, Fanning's testimony about Bruce's own statements was not hearsay. That is to say, at defendant's trial, Fanning's testimony about Bruce's and Hairston's statements was admissible only if the statements fell within an exception to the hearsay rule, in this case the limited exception set forth in *Chambers*. The trial court conducted the appropriate analysis and concluded the statements were not made under circumstances providing considerable assurance of their reliability. This court agreed on direct appeal. See *Grampsas*, 2022 IL App (4th) 2005777-U, ¶ 77 ("[T]he circumstances in this case do not clearly indicate the trustworthiness of the statements allegedly made by Hairston and Bruce to Fanning.").

¶ 105        During Bruce's trial, because Fanning's testimony concerned Bruce's own statements and were offered against Bruce, the statements were not hearsay, and the *Chambers* exception was not necessary to their admission; the statements were admissible on their own as admissions by the defendant. An entirely different analysis applied.

¶ 106        We understand defendant's argument to be, however, that this is unfair. Defendant relies on two cases—*Tenney* and the opinion of this court in *People v. Gray*, 378 Ill. App. 3d 701 (2008)—in support of his argument. However, both *Tenney* and *Gray* are distinguishable and do not support defendant's position.

¶ 107        In *Tenney*, 205 Ill. 2d at 415, the defendant was charged with one count of knowing murder and one count of felony murder based on residential burglary. Prior to defendant's trial, Lionel Lane had been convicted of the victim's murder. *Id.* at 431. Defendant sought the admission of Lorie Mohle's testimony from Lane's trial that included a conversation between Mohle and Lane during which Lane made inculpatory remarks that exculpated

defendant. *Id.* Specifically, Lane told Mohle that he, Lester Salter, and Corey Jenkins broke into the victim's house to rob her, then Salter shot and killed her. *Id.* at 432. The trial court excluded that testimony on hearsay grounds. *Id.* at 431.

¶ 108　　　　On appeal, the defendant argued that the exclusion of Mohle's testimony about Lane's statements denied him a fair trial. *Id.* at 432. The supreme court agreed, conducting its own *Chambers* analysis and concluding that "Lane made his hearsay statement to Mohle under circumstances that provide considerable assurance of its reliability." *Id.* at 436. Specifically, the court concluded that (1) the statement was made spontaneously to a close friend, although it was not made shortly after the crime; (2) the statement was corroborated by other evidence; (3) the statement was against Lane's penal interest; and (4) the declarant was not available for cross-examination. *Id.* at 436-39. The supreme court disagreed with and criticized the trial court's findings that the statement was not corroborated and was not spontaneous. *Id.* at 437-439. As a result, the supreme court concluded that "Lane's hearsay statement was made under circumstances that provide considerable assurance of its reliability," and, as a result, "the trial court abused its discretion in holding to the contrary." *Id.* at 441.

¶ 109　　　　In contrast, in the present case, we have already reviewed the trial court's *Chambers* analysis and concluded that the court did not abuse its discretion by excluding Fanning's testimony about Bruce's and Hairston's statements. *Grampsas*, 2022 IL App (4th) 200577-U, ¶¶ 73-80. Indeed, we agreed that "the circumstances in this case do not clearly indicate the trustworthiness of the statements allegedly made by Hairston and Bruce to Fanning." *Id.* ¶ 77. Most notably, no other evidence corroborated Fanning's testimony. *Id.* ¶¶ 77-79. Additionally, (1) Fanning testified that he was not close with Hairston or Bruce, meaning the statements were not made spontaneously to a close friend; (2) the statements were not made

shortly after the offense; and (3) neither of the declarants were available for cross-examination. As a result, the present case is both factually and procedurally distinct from *Tenney*.

¶ 110    *Gray* is similarly distinguishable and fails to support defendant's argument. In *Gray*, 378 Ill. App. 3d at 702, a jury found the defendant guilty of first degree murder, and the State later tried his codefendant, Marlon Williams, in a separate trial. At the defendant's trial, the State presented evidence that the defendant and Williams worked with the victim, who had been talking about receiving a hefty inheritance. *Id.* The defendant and Williams went to the victim's house and attacked him and demanded money, with Williams ultimately slitting the victim's throat, killing him. *Id.* at 702-05.

¶ 111    The defendant sought to admit Williams's videotaped interview with the police, which contained statements exculpating the defendant—namely, that (1) Williams was the only one who hit and stabbed the victim and (2) the defendant had no idea what Williams was going to do when they went to the house. *Id.* at 706-07. When the State argued that the statement was inadmissible hearsay that lacked the objective indicia of trustworthiness pursuant to *Chambers*, the trial court agreed and barred the use of Williams's statements. *Id.* at 705-06.

¶ 112    On appeal, the defendant argued that the trial court erred by refusing to admit Williams's statement. *Id.* at 706. This court concluded that the trial court had erred by barring the testimony as unreliable because it mistakenly believed that all of the *Chambers* factors must be present for a statement against penal interest to be admissible when, in fact, the *Chambers* factors are merely guidelines and the presence of all four factors is not required for admissibility. *Id.* at 708-09.

¶ 113    This court determined that Williams's statement met many of the criteria for admission: it (1) was made the same day the crime occurred, (2) clearly implicated Williams and

exculpated the defendant, and (3) was substantially corroborated. *Id.* at 710-12. This court found further indicia of trustworthiness in the facts that (1) the statement was made to police officers in response to structured questioning; (2) the statement was video-recorded, which provided proof of the exact contents of the statement; and (3) although the State did not have the opportunity to cross-examine Williams at trial, the police had the opportunity to fully question him about his statement during the interview. *Id.* at 709.

¶ 114        By contrast, these additional indicia of trustworthiness this court found compelling in *Gray* do not exist in the present case. Moreover, at Bruce's trial, only Bruce's own statements were presented, not Hairston's, and Fanning testified only that Bruce (1) said Hairston was with him during the robbery and (2) did not provide any information about anyone else that was there. That is to say, the portion of Bruce's statement presented at his own trial did not exculpate defendant.

¶ 115        Most important, this court has already held on direct appeal that the trial court did not abuse its discretion by barring Fanning's testimony at defendant's trial because Bruce's and Hairston's statements were not made under circumstances providing considerable assurance of their reliability. *Grampsas*, 2022 IL App (4th) 200577-U, ¶¶ 77, 80. Defendant does not address this glaring—and material—distinction in his brief.

¶ 116        Instead, defendant focuses on this court's *dicta* in *Gray* criticizing the order in which the State tried the defendant and Williams in that case. We observed in that case that, because Williams actually testified at his own trial, had he been tried before the defendant, Williams's testimony would have been available to the defendant at the defendant's trial as Williams's former testimony. *Gray*, 378 Ill. App. 3d at 707. We noted that, under these circumstances, "[t]he State may have gained some advantage by the order of trials" and observed

- 26 -

that "[t]he State should not be allowed to prevent Wiliams from testifying in defendant's case simply because it believed his testimony would be helpful to the defendant." *Id.* at 708.

¶ 117    Relying on these comments, defendant asserts in his brief that, similar to *Gray*, "[i]f the State had prosecuted Bruce before [defendant], Fanning's testimony would have been of record and available for [defendant's] trial." Defendant misses the mark. Again, these cases are factually distinct in material ways. In *Gray*, Williams testified at his own trial, meaning he was available for cross-examination by the State. In contrast, in the present case, *Fanning* testified about Bruce's statements at Bruce's trial, meaning Fanning—and not the declarant, Bruce—was available for cross-examination.

¶ 118    Moreover, defendant overstates the importance of our comments about the order of the trials in *Gray*. The issue on appeal was whether the trial court erred by excluding Williams's videotaped interview with the police at the defendant's trial. *Id.* at 706. Because we believed the trial court conducted an erroneous *Chambers* analysis, we concluded that the court had abused its discretion by excluding the evidence. *Id.* at 708-12. Our comments about potential unfairness resulting from the order of the trials were not critical to our analysis or holding, but instead were observations (1) unique to the facts of that case and (2) critical of any potential gamesmanship. Those comments in no way "prohibit[ ]," as defendant asserts in his brief, the State's choice to prosecute defendant first and seek to bar Bruce's and Hairston's hearsay statements, then prosecute Bruce second and seek to include his own non-hearsay admissions.

¶ 119    For the foregoing reasons, we conclude that defendant has failed to make a substantial showing that his rights to due process, a fair trial, or to present a full defense were violated.

¶ 120    2. *Defendant's Actual-Innocence Claim*

¶ 121    Defendant next argues he made a substantial showing of actual innocence based upon new evidence from three witnesses: Tornowski, Harris, and King. We disagree.

¶ 122                                a. The Applicable Law

¶ 123    In *People v. Robinson*, 2020 IL 123849, ¶¶ 47-48, the Illinois Supreme Court set forth the law applicable to postconviction claims of actual innocence, writing as follows:

> "To establish a clam of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character it would probably change the result on retrial. [Citations.] Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence. [Citation.] Evidence is material if it is relevant and probative of the petitioner's innocence. [Citation.] Noncumulative evidence adds to the information that the fact finder heard at trial. [Citation.] Lastly, the conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result. [Citation.] The conclusive character of the new evidence is the most important element of an actual innocence claim. [Citation.]
>
> Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt. [Citation.] The new evidence need not be entirely dispositive to be likely to alter the result on retrial. [Citation.] Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence."

¶ 124                          b. Tornowski

¶ 125        Defendant contends that the trial court erred by finding that Tornowski's affidavit did not constitute newly discovered evidence. We disagree.

¶ 126        " '[N]ew' for purposes of an actual innocence claim means evidence that was discovered after trial and that could not have been discovered earlier through the exercise of due diligence." *People v. Harris*, 2024 IL 129753, ¶ 52.

¶ 127        Tornowski testified at trial about hearing defendant's and Harris's voices sometime before her 4:45 a.m. alarm went off. Defense counsel asked her, "Can you tell us approximately what time that would have been?" Tornowski answered, "I don't know a time." Now, in her postconviction affidavit, she claims that, after reviewing her trial testimony, she recalls that she woke up after 4:30 a.m. Unfortunately for defendant, a witness's recovered memory does not constitute newly discovered evidence under the Act. See *People v. Moore*, 2018 IL App (3d) 160271, ¶ 17 (" 'It would be a dangerous rule to grant a new trial upon an *ex parte* statement that certain material facts which had previously been known had been forgotten.' ") (quoting *People v. Williams*, 242 Ill. 197, 207-08 (1909)).

¶ 128        Accordingly, we agree with the trial court that Tornowski's affidavit did not constitute newly discovered evidence that could not have been discovered earlier through the exercise of due diligence.

¶ 129                          c. Harris

¶ 130        Defendant also argues that the trial court erred by finding that Harris's affidavit similarly did not constitute newly discovered evidence. Specifically, defendant contends that the court erroneously determined that Harris was available to testify because, as Harris stated in his affidavit, he did not testify at defendant's trial because he feared he would be prosecuted for the

- 29 -

murder. Defendant asserts that a witness who properly asserts his fifth amendment privilege not to testify is deemed unavailable.

¶ 131 The record demonstrates that the trial court, on June 29, 2020, at the request of the State, entered an order granting use immunity to Harris pursuant to section 106-2.5(b) of the Code of Criminal Procedure of 1963 (725 ILCS 5/106-2.5(b) (West 2020)). Harris appeared in court on that date and was appointed counsel, with whom he conferred regarding the State's request. The court itself explained to Harris that, if the State's request were granted, the State "would be prohibited from using anything, either directly or indirectly, that you would testify to truthfully, even if those statements would be incriminating of yourself." Harris indicated that he understood. The court further explained, "And since there is no possibility of self-incrimination, that you cannot, if you're called to testify as a witness in this case, assert the fifth amendment." Harris again indicated that he understood. The court then entered the written order granting use immunity, which stated that "the production of evidence by KOEBE HARRIS at this jury trial, and any information directly or indirectly derived from it, may not be used against KOEBE HARRIS in a criminal case."

¶ 132 The record further demonstrates that Harris appeared in court on the first day of the jury trial pursuant to a subpoena by the State. Indeed, the State requested, "And then even though the Court previously admonished [him], Koebe Harris also showed up so we'd just ask to admonish again on him." The trial court explained to Harris and the other witnesses who were not needed that day the following:

> "[Y]our subpoenas aren't just in effect for today, they continue throughout the
> course of the trial until and unless you would either testify as a witness in this
> case or be informed that you will not be testifying as a witness in this case.

There's also a possibility that even if you were called as a witness by the State, that you could or might also then be called as a witness by the defense at a later time."

The court then asked the prosecutor whether the potential witnesses had been informed regarding who would be contacting them, and the State (1) identified that person by name and (2) affirmed that person had already contacted each witness and was in possession of their phone numbers and addresses.

¶ 133       The trial court then asked the attorneys, "Are both sides, that being the State and the defense, satisfied that the Court has admonished the potential witnesses to the degree that you are satisfied and to ensure that if and when such witnesses' testimony is needed, that they will be here?" Defense counsel answered, "I believe so."

¶ 134       Later, on the sixth day of trial, the prosecutor advised the trial court that the State intended to "withdraw the offer of immunity and *** limit[ ] [Harris's] testimony" to "what he told [the Bloomington Police Department] about his whereabouts." The trial court asked Harris's attorney if Harris would be testifying or attempting to assert a privilege, and counsel replied, "Your Honor, I need to speak with him a little further about that." Nonetheless, no further discussion occurred, the trial court never vacated its order, and no party attempted to call Harris as a witness. Importantly, despite the State's musings about withdrawing the immunity order, the State took no action to do so, the court's immunity order remained in effect, and Harris never attempted to assert a privilege.

¶ 135       As the record demonstrates, securing Harris's testimony at trial would likely have been an easy thing to do, given (1) the grant of use immunity containing an order to "answer questions *** probative on the issues set forth in [defendant's] trial" and (2) Harris's appearance

pursuant to two State subpoenas—one for the use immunity proceedings and another for the jury trial. As we have already noted, evidence is "new" for purposes of an actual innocence claim if it could not have been discovered earlier through the exercise of due diligence. *Harris*, 2024 IL 129753, ¶ 52.

¶ 136      Defendant has failed to allege any attempt to secure Harris's testimony at trial. And Harris's claim that he did not testify because he feared being prosecuted does not render his testimony unavailable at the time of trial because he had been granted immunity for his testimony.

¶ 137      Moreover, even if Harris had not been granted immunity, "[n]either an unreasonable fear of self-incrimination nor a mere reluctance to testify is a ground for claiming the privilege," and "the mere say-so of a witness does not of itself establish the hazard of incrimination." (Internal quotation marks omitted.) *People v. Redd*, 135 Ill. 2d 252, 304 (1990)). "Once a witness asserts his fifth amendment privilege not to incriminate himself, then it is for the circuit court to determine if under the particular facts there is a real danger of incrimination." (Internal quotation marks omitted.) *Id.* Accordingly, Harris's " 'say-so' " (*id.*) in his affidavit is insufficient to demonstrate that he was unavailable at the time of trial.

¶ 138      For these reasons, we conclude Harris was an available witness at the time of trial who was known to defendant, and defendant has failed to show that Harris's postconviction affidavit constitutes newly discovered evidence that could not have been discovered earlier through the exercise of due diligence.

¶ 139                                    d. King

¶ 140      Defendant contends that the trial court erred by concluding that King's affidavit was not of such a conclusive character that it would probably change the result on retrial. We

disagree.

¶ 141    King averred in his affidavit that just two days after the murder, Hairston told King that he and "Little Bro" dropped defendant and Harris off at Harris's house and then went to Dover's home, where Hairston shot Dover. Even (1) setting aside the hearsay nature of King's affidavit and (2) accepting as true the contents of his affidavit, King's information is not likely to change the result on retrial. The jury could believe that defendant was at Harris's house when the shooting occurred and still find defendant guilty by accountability based upon the evidence that defendant (1) was present when the robbery was discussed at Newble's apartment, (2) left immediately thereafter with Hairston, Bruce, and Harris, (3) provided the car that transported Harris and Bruce to Dover's house, and (4) changed the tires on the car after the crime.

¶ 142    Additionally, defendant failed to establish that King's affidavit was newly discovered evidence that defendant could not have been discovered earlier through the exercise of due diligence because he alleged no facts explaining when or how he became aware of King's information, which King acquired just two days after the offense occurred—well before defendant's trial.

¶ 143    Accordingly, we conclude that the trial court did not err by dismissing defendant's postconviction claim of actual innocence.

¶ 144        3. *Defendant's Ineffective-Assistance-of-Counsel Claim*

¶ 145    Last, defendant argues he made a substantial showing that his right to the effective assistance of counsel was violated when his trial counsel failed to object to the "voluminous" firearms evidence that was introduced at trial "because all of that evidence was unconnected to the crime." We disagree.

¶ 146                    a. The Applicable Law

- 33 -

¶ 147　　　"To prevail on a claim of ineffective assistance of counsel, a defendant must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984)." *People v. Haynes*, 2024 IL 129795, ¶ 23. Namely, a defendant alleging ineffective assistance "must first show that, despite the strong presumption that the challenged action was the product of sound trial strategy, counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, such that he or she was not functioning as the counsel guaranteed by the sixth amendment." *Id.* "Second, the defendant must establish prejudice by showing a reasonable probability that the proceeding would have resulted differently absent counsel's errors." *Id.* "A defendant's failure to establish either prong of the *Strickland* test precludes a finding of ineffectiveness." *Id.*

¶ 148　　　"Under the [deficient performance] prong, counsel is afforded wide latitude when making tactical decisions, and the law presumes counsel will faithfully fulfill his or her role envisioned by the sixth amendment (U.S. Const., amend VI)." *People v. Brose*, 2025 IL App (4th) 241407-U ¶ 58 (citing *Strickland*, 466 at 688-89). "Hence, counsel's assistance must fall 'outside the wide range of professionally competent assistance,' considering all the circumstances." *Id.* (quoting *Strickland*, 466 U.S. at 690). "Further, choices of trial strategy are virtually unchallengeable because such a choice 'is a matter of professional judgment to which a review of counsel's competence does not extend.' " *Id.* (quoting *People v. Cundiff*, 322 Ill. App. 3d 426, 435 (2001)); accord *People v. Manning*, 241 Ill. 2d 319, 327 (2011) ("Matters of trial strategy are generally immune from claims of ineffective assistance of counsel.").

¶ 149　　　Generally, "decisions regarding 'what matters to object to and when to object' are matters of trial strategy." *People v. Perry*, 224 Ill. 2d 312, 344 (2007) (quoting *People v. Pecoraro*, 175 Ill. 2d 294, 327 (1997), and citing *People v. Graham*, 206 Ill. 2d 465, 478-79

(2003)). An attorney's strategic decisions should be evaluated from counsel's "perspective at the time, rather than through the lens of hindsight." *Id.*

¶ 150 "Whether a defendant received ineffective assistance of counsel is a question of law that we review *de novo*." *Haynes*, 2024 IL 129795, ¶ 23.

¶ 151                          b. Application to This Case

¶ 152 Trial counsel's decision not to object to the firearms evidence in this case was a matter of trial strategy. Indeed, although on direct appeal, defendant argued simply that the admission of the firearms evidence prejudiced him because it served merely to associate him with common criminal activity, and not that his counsel was ineffective for failing to object, as he now argues, this court concluded on direct appeal that "it appears defense counsel had a strategy to allow this evidence into the case." *Grampsas*, 2022 IL App (4th) 200577-U, ¶ 83.

¶ 153 In his postconviction petition, defendant attached his own affidavit, stating that he repeatedly asked his trial counsel to object to the evidence. This allegation, taken as true, does not establish ineffective assistance of counsel. As we have noted, decisions about what to object to are matters of trial strategy, which are left to counsel and not the defendant. *Perry*, 224 Ill. 2d at 344; see *People v. Medina*, 221 Ill. 2d 394, 403 (2006) ("[T]here are four decisions that ultimately belong to the defendant in a criminal case after consultation with his attorney: (1) what plea to enter; (2) whether to waive a jury trial; (3) whether to testify in his own behalf; and (4) whether to appeal. *** Beyond these four decisions, however, trial counsel has the right to make the ultimate decision with respect to matters of tactics and strategy after consulting with his client." (Internal quotation marks omitted.)).

¶ 154 Defendant also argues that defense counsel's failure to object amounted to deficient performance that prejudiced him because much of the firearms evidence was unrelated

to the offense and therefore inadmissible. We disagree. As the State notes in its brief, the police located fired .380-caliber and 9-millimeter cartridge cases at the crime scene, a .380-caliber bullet was recovered from Dover's body, and he suffered two additional bullet wounds. The State's theory at trial was that defendant was part of a plot with Hairston and Bruce to rob Dover; therefore, defendant was accountable for the actions of the shooter. The State was required to prove that defendant or one for whose conduct he was legally responsible personally discharged a firearm. Accordingly, evidence that Hairston possessed a .380-caliber handgun and took a 9-millimeter handgun from Messerole was relevant and admissible.

¶ 155          Further, we agree with the State's assertion in its brief that the "admission of evidence regarding air guns, the .22 rifle, the .25 pistol, the .44 caliber cartridge cases, the .40 pistol, and the .45 pistol and ammunition" went "primarily to the thoroughness of the investigation to preclude any argument on the part of defendant that the State had failed to prove him guilty due to the poor quality of their investigation." As the State notes, "[n]one of this evidence was linked to the defendant" and the "[e]xclusion of this evidence could not have had any impact on defendant's conviction *** based on his knowledge that a robbery was planned, provision of the car used in the offense, destruction of evidence by changing the car's tires, and admission to being present whenever things went down."

¶ 156          Last, we also agree with the assertion that the State made on direct appeal that defense counsel could reasonably have "wanted to focus the jury's attention on the other guns to try to point to other suspects and to sow confusion about the guns and who owned them." *Grampsas*, 2022 IL App (4th) 200577-U, ¶ 84.

¶ 157          For the foregoing reasons, we conclude that defendant has failed to make a substantial showing that his trial counsel rendered ineffective assistance for not objecting to the

firearms evidence.

¶ 158                                    III. CONCLUSION

¶ 159          For the reasons stated, we affirm the trial court's judgment.

¶ 160          Affirmed.